**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In Re:

THOMAS V. GIRARDI, Esq.; WALTER
J. LACK, Esq.; PAUL A. TRAINA,
Esq., et al.,

*Respondents.*

Nos. 08-80090
03-57038

D.C. No.
CV-03-05094-NM

ORDER

SONIA EDUARDA FRANCO
FRANCO; et al.,

*Plaintiffs-Appellants,*

v.

DOW CHEMICAL COMPANY; et al.,

*Defendants-Appellees.*

Filed July 13, 2010

Before: William A. Fletcher, Marsha S. Berzon,
N. Randy Smith, Circuit Judges.

## ORDER

We must decide the appropriate discipline in the case of respondents Thomas V. Girardi, Walter J. Lack, Paul A. Traina, and a junior associate in Lack's firm. Respondents attempted to enforce a putative foreign judgment for $489 million in district court but failed. They undertook and maintained an appeal to this court although they knew, at least by the time defendants filed a motion to supplement the record in this court, that the document they offered as evidence of that judgment was spurious.

### 1. Background

The factual and procedural background of the case is complicated but essentially uncontested.[1] Respondents Thomas V. Girardi and Walter J. Lack are Los Angeles-based lawyers who have practiced law together for 25 years, while maintaining separate firms. They are highly experienced and highly successful practitioners. Typically, in the cases they take on jointly, Girardi and Lack divide responsibilities between their respective law firms, Girardi & Keese (the "Girardi Firm") and Engstrom, Lipscomb & Lack (the "Lack Firm"). In some cases, the Girardi Firm has the primary responsibility; in others, the Lack firm has the primary responsibility.

On November 13, 2000, Lack and Girardi agreed to engage in one such legal joint venture, signing a Master Fee Agreement with the Nicaraguan law firm of Ojeda Gutierrez and Espinoza (the "Ojeda Firm") to represent Nicaraguan claimants in litigation concerning the effects of the pesticide Dibromochlorpropane (DBCP) on banana plantation workers. Lack and the Lack Firm would have complete responsibility for the complaint and all other filings in the case.

In September 2001, Sonia Eduarda Franco and 465 other Nicaraguan plaintiffs sued several American companies for injuries allegedly caused by the companies' use of DBCP on banana plantations in Nicaragua. Lack coordinated with the Ojeda firm, drawing upon his knowledge and experience with other pending DBCP litigation around the world. Lack identified five proper defendants: Dole Food Company, Shell Oil Company, Shell Chemical Company, Dow Chemical Company, and Standard Fruit Company. The Nicaraguan complaint, however, named as defendants Dole Food Corporation and Shell Oil Company, but *not* Dole Food Company or Shell

---

[1]The background of the case is fully set forth in the Report and Recommendation of the Special Master, the Honorable A. Wallace Tashima, a redacted copy of which is appended to this order.

Chemical Company. While the Nicaraguan complaint mentions "Dole Food Company," it lists "Dole Food Corporation," and not "Dole Food Company" as a defendant in the action, although there is no such entity as "Dole Food Corporation."

Despite the misidentification, the complaint was served on Dole Food Company at its corporate headquarters in Westlake, California. Dole Food Company authorized Dr. Roberto Arguello Hurtado, its Nicaraguan counsel, to appear in the Nicaraguan proceeding on behalf of Dole Fresh Fruit Company, another Dole entity that was currently doing business in Nicaragua, but which did not exist at the time of the events described in the complaint and which was not named in the complaint. For that reason, Plaintiffs' Nicaraguan lawyer, Angel Espinoza, moved successfully, on October 25, 2002, to exclude Dole Fresh Fruit Company from the proceedings. Realizing the problem with the complaint, Espinoza petitioned the Nicaraguan court on November 12, 2002, to change the names of Defendants from Dole Food Corporation and Shell Oil Company to Dole Food Company and Shell Chemical Company. As far as the record shows, the Nicaraguan judge never ruled on that petition.

Following the court's exclusion of Dole Fresh Fruit Company from the case, Dole Food Company authorized Dr. Hurtado to appear on behalf of Dole Food Company. Dr. Hurtado represented to the Nicaraguan court that Dole Fresh Fruit Company was confused by the initial complaint, and continued to be concerned that Plaintiffs' failure to sue the right person "could lead to injuries to its rights." On November 25, 2002, the Nicaraguan court denied Hurtado's intervention on behalf of Dole Food Company because the complaint was "not brought against" Dole Food Company. The Judicial Notice further advised that the rights of Dole Food Company should be "exercised through relevant channel."

On December 11, 2002, the Nicaraguan court issued a $489 million default judgment ("Judgment") against ( in English)

"Dole Food Corporation" and "Shell Oil Company." The Judgment did not mention Shell *Chemical* Company, nor did it name Dole Food *Company* as a judgment debtor. Although the Judgment referred to Dole Food Company, it did so only to describe Hurtado's attempted intervention and to restate that Dole Food Company was not one of the defendants named in the complaint.

Angel Espinoza was the main lawyer at the Ojeda Firm handling the Franco case. The lawyers at the Lack Firm never spoke with him, instead communicating only with Walter Gutierrez, the English-speaking nonlawyer-administrator of the Ojeda firm. Lack had communicated extensively with Gutierrez throughout the Nicaraguan proceedings, and he did so again when he learned in January 2003 that the Dole Food Company claimed that the Judgment named Dole Food Corporation, not Dole Food Company. In an email to Gutierrez, Lack emphasized that

> There must be a perfect match between the names of the entities served and the names of the entities against whom judgment has been obtained. If this form of judgment has been submitted to the Supreme Court for certification it must be modified now which might require a meeting with the trial judge to correct "clerical error." This is a simple legal step that your lawyers should be taking care of.

On January 23, 2002, at Espinoza's request, the Nicaragua court issued the "Ejecutoria," or Writ of Execution, to Plaintiffs' counsel. The Writ, like the Judgment, named "Dole Food Corporation" and "Shell Oil Company," in English, as judgment debtors, and, like the Judgment, described the court's rejection of Hurtado's attempt to intervene on behalf of Dole Food Company because his client was not one of the companies named in the complaint.

On January 27, 2003, Gutierrez notified Lack and Girardi by email that he "had arrived back in the US," and that he

would like to meet with them to discuss, among other things, the "[a]ctual correction [sic] translation of the judgment and execution thereof[.]" There is no evidence Gutierrez produced either the Judgment or the Writ of Execution at the January meeting, and Respondents deny that the documents were provided to any of the Lack attorneys over the next several months. On the other hand, there is also no evidence that Lack, Girardi, or anyone from their firms asked to see the Judgment or the Writ of Execution, even though Lack knew that they needed a judgment against the correct entity for a United States enforcement action to succeed.

On April 24, 2003, a Nicaraguan notary public, Miguel Angel Caceres Palacios, issued the Notary Affidavit that would prove central to this case. The Notary Affidavit begins with the statement that Angel Espinoza, accompanied by a translator, presented the notary with the following document, i.e., the Writ of Execution. The Notary Affidavit purports to provide an exact Spanish-language transcription of the Writ, but it contains significant differences. Where the names "Dole Food Corporation" and "Shell Oil Company" appear in the Writ in English, the Notary Affidavit substitutes, also in English, "Dole Food Company" and "Shell Chemical Company." Because of this substitution, the Notary Affidavit is facially inconsistent, stating both that the Dole Food Company is a judgment debtor, and that the Dole Food Company was denied the opportunity to appear because it was not one of the companies sued.

On May 14, 2003, Lack and Girardi filed an action in Los Angeles Superior Court under California's Recognition Act, the statute that at the time governed enforcement of foreign money judgments. *See* Cal. Civ. Proc. Code §§ 1713-1713.8 (repealed 2007). The Complaint attached the Notary Affidavit as "Appendix A" and identified the document as the Writ itself. "Appendix A," however, did not contain the entire text of the Notary Affidavit, as it omitted the entire Spanish-language introductory paragraph identifying the document as

a transcription. The Complaint was misleading in other respects, as it stated that the Nicaraguan court "entered judgment . . . against all defendants," although Lack knew the original Judgment named Dole Food Corporation and not Dole Food Company, and he had no basis for concluding that the problems he had identified in January had in fact been cured or that the name changes appearing in the Notary Affidavit were approved by any court. Moreover, the Complaint stated that "[t]he original certified copy of the Writ of Execution is within the custody of Plaintiffs' counsel," although Lack now maintains that he did not in fact have even a copy of the Writ until April, 2005, as described below.

On June 25, 2003, at Defendants' request, Lack sent defense counsel a complete copy of the Notary Affidavit, stating that earlier, "we deleted certain portions of the Spanish part since they were deemed superfluous to the Judgement [sic]." Armed with a copy of the complete Notary Affidavit, Dow Chemical Company ("Dow") and Shell Chemical Company ("Shell") removed the action to federal court on July 17, 2003. Dow and Shell argued in their Notice of Removal that although Dole Food Company, a California corporation, was a local defendant, there was nevertheless complete diversity because Dole Food Company was fraudulently joined. Contrary to the representation in the Complaint and "Appendix A," Dole Food Company was not a party to the Nicaraguan proceeding and so Dole Food Company could not be — and was not — subject to the default judgment. Moreover, Dow and Shell maintained that "Appendix A" to Plaintiffs' Complaint was not the Writ but a "facially inaccurate post hoc recitation of the judgment, incorporated within a transcribed and translated version of a writ of execution, all contained in a form secured ex parte from a notary public." The Notice of Removal also contained originals and English translations of the Judgment itself, the complete Notary Affidavit, and additional documents from the Nicaraguan litigation demonstrating that Dole Food Corporation, not Dole Food Company, was the defendant in those proceedings. On July 24, 2003,

Defendants moved to dismiss the complaint, citing the same infirmities, and pointing out that "Appendix A" was "at least four steps removed from the actual Judgment."

On August 14, 2003, Plaintiffs moved to remand the action to state court and filed a reply to Defendants' motion to dismiss. In their Motion to Remand, Plaintiffs, as they did in the Complaint, falsely asserted that the Complaint attaches "[t]he actual Judgment/Writ of Execution which names Dole Food Company Inc. as a party," and that the Writ named Dole Food Company and Shell Chemical as judgment debtors. Although Lack's signature appeared on Plaintiffs' Motion to Remand, Opposition Brief to Defendants' Motion to Dismiss, and Reply to Defendants' Opposition to Plaintiffs' Motion to Remand, the primary responsibility for preparing these briefs fell on Respondent Paul Traina, who had been a member of the Lack firm since 1996. Traina's briefing argued that the district court could not reach the merits of the enforcement action, even as it repeated the false characterization of the document that was the entire basis for that action. To support the inaccurate statements, Respondents attached three declarations to their reply brief: an "expert" declaration from Lorena Centeno, a California lawyer who had graduated from a Nicaraguan law school; a declaration from Orlando Corrales Mejia, a former Vice President of the Nicaraguan Supreme Court; and a declaration from Espinoza of the Ojeda Firm.[2]

On October 16, 2003, District Judge Manella denied Plaintiffs' Motion to Remand, finding that Dole Food Company, the "local defendant" that would have destroyed diversity, was not a party to the Nicaraguan judgment because Plaintiffs' alleged "translated version of the Writ of Execution"

---

[2]As detailed in Judge Tashima's Report, none of these declarations provided solid support for the propositions about Nicaraguan law for which they were offered. Moreover, the declarants have subsequently claimed that they did not draft their own affidavits and that they disagreed with some of the statements made in those declarations.

was actually executed three months after the Writ issued, contained no assurance of its accuracy, and "recites facts inconsistent with the naming of Dole Food Company Inc. as a party to the underlying action." *Franco v. Dow Chemical Co.*, 2003 WL 24288299, at *3 (C.D. Cal. Oct. 20, 2003). Judge Manella concluded the Notary Affidavit was "suspect, not only because it changes the names of two parties that appeared in English in the Judgment, but because it contradictorily orders 'Dole Food Company Inc.' to pay, while reciting that neither 'Dole Food Company' nor 'dole [sic] Food Company, Inc.' was a party to the action." *Id.* at *4. Judge Manella also noted that Plaintiffs' Complaint failed to comply with the plain language of the Recognition Act, insofar as the Act provides a mechanism for enforcing judgments, not writs of execution. *See id.* at *5. The district court also granted Defendants' Motion to Dismiss.

On November 20, 2003, Respondents filed a notice of appeal to the Ninth Circuit. Lack and Traina delegated the duty of drafting the Opening Brief to a junior associate, who had less than two years's experience as a lawyer and no previous appellate experience. On April 30, 2004, Respondents filed an Opening Brief that repeated false statements made before the district court, declaring that "Appendix A" was the January 2003 Writ, that the January 2003 Writ names Dole Food Company and Shell Chemical Company as judgment debtors, that the "Writ," (which is what Respondents continued to call the Notary Affidavit), is "dispositive of the fact that Dole Food Company is a proper defendant,"and that the December 11, 2002 Judgment named Dole Food Company and Shell Chemical Company as defendants.

Defendants filed their Appellees' Brief on June 30, 2004, again arguing that "it is obvious that plaintiffs have not stated a cause of action to enforce the Nicaraguan judgment against Dole Food Company, Inc., for the simple reason that this entity was not named in the underlying Nicaraguan complaints or judgment and was affirmatively denied an opportu-

nity to participate in the Nicaraguan proceedings for just that reason[.]" Defendants also noted that on May 18, 2004, during the pendency of this appeal, the Nicaraguan court had issued another writ of execution in conjunction with efforts to enforce the same judgment against assets located in Venezuela, and the new writ confirmed that neither Dole Food Company nor Shell Chemical Company were parties to the original judgment.

On August 9, 2004, the junior associate sent Traina a memo in which he expressed his concerns about the viability of their position, noting that the firm risked exposure to a motion under Federal Rule of Appellate Procedure 38, which would provide for an award of damages and double costs if their appeal were found to be frivolous. Traina, in consultation with Lack, responded to the junior associate's concerns about the basis of their case, and the associate drafted a reply brief which was filed on August 13, 2004. The reply brief argued that "plaintiffs' Complaint had properly alleged that plaintiffs have a final judgment for a sum of money in their favor against Dole."

While the appeal was pending, the same parties were engaged in a related case in district court, a declaratory relief action that Shell had brought against the *Franco* plaintiffs. In the course of discovery in that proceeding, Shell sought a copy of the January 23, 2003 Writ of Execution. Respondents vigorously opposed those efforts, but on April 15, 2005, were required to deliver the original January 2003 Writ, which had been in the possession of the Ojeda firm, to Shell, and Shell shared the document with its co-defendants in the *Franco* case. The *Franco* Defendants moved to supplement the record in the pending Ninth Circuit appeal with the Writ, which demonstrates on its face that Plaintiffs had been misrepresenting its contents. They also moved for sanctions for (1) filing a frivolous appeal and (2) making false statements. Respondents unsuccessfully opposed the motion to supplement the record and filed a counter-motion for sanctions.

Around July 6, 2005, only a week before oral argument, Howard B. Miller, a member of the Girardi Firm, was asked to argue the appeal. After reviewing the record for six to eight hours, Miller determined that the appeal should be dismissed, because the case had been argued entirely on the mistaken premise that the Writ named the Dole Food Company, a thesis contradicted by the recently produced original writ. Respondents dismissed the *Franco* appeal on July 11, 2005.

On August 25, 2005, this Court issued its order to show cause, directed to Girardi, Miller, Lack, Traina, the junior associate, and the two law firms representing Plaintiffs in the Ninth Circuit. The order directed Respondents to show cause "why it or he should not be required to reimburse the appellees for fees and expenses incurred in defending this appeal, and why it or he should not be suspended, disbarred, or otherwise sanctioned, under Federal Rules of Appellate Procedure 38 and 46 and 28 U.S.C. § 1912 and § 1927, for filing a frivolous appeal, falsely stating that the writ of execution issued by the Nicaraguan court named Dole Food Company, Inc. as a judgment debtor, falsely stating that the writ corrected mistakes in the judgment, and falsely stating that the notary affidavit constituted an accurate translation of the writ."

On March 28, 2006, the Panel directed that the order to show cause be discharged as to Respondent Howard Miller, and it appointed Judge Wallace A. Tashima of this court as Special Master to oversee further proceedings. After extensive discovery and briefing, Judge Tashima presided from October 22nd to 25th, 2007, over a four-day trial of the issues relevant to the order to show cause. On March 21, 2008, Judge Tashima filed a detailed report addressing the motion for sanctions, in which he concluded that Girardi had "recklessly" made false statements to the Ninth Circuit, while the three Respondents from the Lack firm had done so "knowingly, intentionally and recklessly." Judge Tashima recommended imposing sanctions totaling $390,000. The Respondents have

stated that they are prepared to accept the monetary sanctions recommended by Judge Tashima.

On the same day, Judge Tashima filed under seal a brief Supplemental Report addressing the question of attorney discipline. The Supplemental Report incorporated the findings and conclusions of Judge Tashima's main report and recommended that a "disinterested prosecutor" be appointed if the Panel deemed further proceedings necessary. In response to the Supplemental Report, the three Lack firm Respondents filed objections to the findings and conclusions of the first Report insofar as they were incorporated in the Supplemental Report, and all four Respondents requested the opportunity to present further evidence in mitigation. The Panel appointed Professor Rory K. Little as Independent Prosecutor on July 10, 2008.

On May 12, 2009, Professor Little filed his report detailing his own investigation and review of Judge Tashima's record. Professor Little stated his belief that "the Respondents did not really contest the material facts in the [Special Master's] Report and Supplemental Report, so much as they wished to dispute the inferences and legal conclusions drawn from those facts, and emphasize some other facts not included in either Report although developed at trial." Professor Little's report stated that Respondents did not dispute that the three statements set forth in the order to show cause were in fact false and "that the Respondents acted at least recklessly in failing to detect those falsities and permitting them to appear in their [o]pening appellate brief and to stand uncorrected even through the date of oral argument in July 2005." The report also concluded that Judge Tashima's findings regarding the Respondent's states of mind "are accurate and provable by clear and convincing evidence." The balance of Prof. Little's report outlined proposed discipline to which the Respondents were prepared to stipulate.

On October 7, 2009, Judge Tashima filed a corrected version of his March 21, 2008 report. We adopt in full Judge Tashima's findings of fact, conclusions of law, and recommendations with respect to sanctions under Federal Rule of Appellate Procedure 38 and 28 U.S.C. § 1912 and § 1927 as they appear in that corrected version.[3] We turn now to the question of discipline under Federal Rule of Appellate Procedure 46.

## 2.    *Applicable Legal Standard*

"A member of the court's bar is subject to suspension or disbarment by the court if the member . . . is guilty of conduct unbecoming a member of the court's bar." Fed. R. App. P. 46(b)(1)(B); *see Gadda v. Ashcroft*, 377 F.3d 934, 947 (9th Cir. 2004) (listing examples of "conduct unbecoming"). Furthermore, the court "may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule." Fed. R. App. P. 46(c). A court need not find intentional conduct to discipline an attorney for conduct unbecoming a member of the bar pursuant to Federal Rule of Appellate Procedure 46; lack of diligence that impairs the deliberations of the court is sufficient. *See Gadda*, 377 F.3d at 947.

"Conduct unbecoming a member of the court's bar" means "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice." *In re Snyder*, 472 U.S. 634, 645 (1985); *see also Gadda*, 377 F.3d at 946. In addition to case law and applicable court rules, the court may consider codes of professional conduct in deter-

---

[3]As Judge Tashima has recused himself from further duties as Special Master, we refer the issue of sanctions to Appellate Commissioner Peter L. Shaw, who shall conduct whatever proceedings he deems appropriate and consistent with Judge Tashima's report, and who shall have authority to enter an order awarding fees, subject to reconsideration by the panel.

mining whether an attorney's conduct falls below the standards of the profession. *See In re Snyder*, 472 U.S. at 645, 646 n.7 (referring to state rules of professional conduct, and the American Bar Association's ("ABA") Model Rules of Professional Conduct and Model Code of Professional Responsibility).

Here, the conduct identified in the order to show cause clearly constitutes "conduct unbecoming a member of the court's bar," because it violates the ABA's Model Rules as well as California rules of professional conduct. *See* Model Rule 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); Model Rule 3.3(a) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer"); Cal. Rule Prof. Conduct 5-200 ("In presenting a matter to a tribunal, a member: (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth; (B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law[.]"); *see also* Cal. Bus. & Prof. Code § 6068(d) (codifying lawyer's duty not "to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.").

In assessing the appropriateness of a particular disciplinary sanction, this court may consider, although it is not bound by, the ABA's Standards for Imposing Lawyer Sanctions, which were promulgated to aid enforcement of the ABA's Model Rules of Professional Conduct. *See United States v. Swanson*, 943 F.2d 1070, 1076 (9th Cir. 1991); *see also* ABA Joint Comm. on Prof'l Standards, *Standards for Imposing Lawyer Sanctions* (1984, rev. 1992), *available at* http://www.abanet.org/cpr/regulation/standards_sanctions.pdf

("*Standards*"). Under these standards, a court should generally consider: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *See Standards* § 3.0. The *Standards* also set out various forms of suggested discipline based on the type of misconduct involved. *See id.* §§ 4.0-8.4.

### 3. Discussion

Although we are concerned here only with Respondents' conduct in this court, the entire course of Respondents' effort to enforce the Nicaragua judgment is relevant to determining Respondents' culpability. As outlined above, the history of the enforcement proceedings includes several crucial moments where a reasonable attorney would have, at a minimum, inquired further about the bona fides of the document that was the basis of the action he was prosecuting. At some point, failing to do so becomes willful blindness.

The official comments to Model Rule 3.1 recognize that an attorney may not know whether his claims are viable when he files an action, but he has a duty to investigate the legal and factual bases of his claims:

> The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions.

Model Rule 3.1, cmt. 2; *see also Holgate v. Baldwin*, 425 F.3d 671, 676-77 (9th Cir. 2005) (reviewing circuit precedent that a "frivolous" filing in the context of Rule 11 is one "that

is *both* baseless *and* made without a reasonable and competent inquiry").

As early as January 2003, respondents Lack and Girardi were aware that the Nicaraguan Judgment named the wrong defendant and that the discrepancy could doom any enforcement action in American courts. Even if neither Respondent saw the actual Judgment or Writ of Execution in 2003, the receipt of the Notary Affidavit, erroneously identified as the Writ and attached to the Superior Court Complaint as "Appendix A," should have prompted further investigation, because it contained the inconsistent statements that Dole Food Company was a judgment debtor and that it was not a party to the case. Moreover, the Complaint contained the false statement that the Lack firm had the original of the Writ of Execution, when it did not.

Respondents' subsequent actions were more obfuscation than investigation. Confronted with Defendants' Notice of Removal and Motion to Dismiss, which detailed accurately how "Appendix A" was several removes from the actual Judgment Plaintiffs sought to enforce, Respondents doubled down on their increasingly untenable position. By his own admission, Respondent Traina did virtually nothing to investigate and determine the veracity of the statements made in the Complaint, even though the Notary Affidavit, on its face, presents questions as to its authenticity and even though Defendants' central argument called into question the accuracy of the statements made in Plaintiffs' Complaint.

Even if Respondents felt confident in dismissing their adversaries' arguments, Judge Manella's careful and detailed decision should have given them pause in pursuing an appeal, as it laid bare the fundamental and fatal flaws in their enforcement action and in the Notary Affidavit attached to the Complaint. Respondents have consistently argued that the appeal was taken in good faith because it reasonably challenged the district court's jurisdiction to weigh the evidence relevant to

the allegedly false joinder of Dole Food Company. This argument is unavailing. Even if Respondents' interpretation of Ninth Circuit case law on fraudulent joinder were correct — an issue we do not reach — Respondents advanced their jurisdictional arguments in briefing that relied upon false statements about the documents central to their enforcement action. Moreover, the false statements were now being made in the face of new evidence, such as the second writ of execution used to enforce the Nicaraguan judgment in Venezuela, that called into question Respondents' version of events.

By the time Respondents were forced in the related declaratory relief action in April 2005 to produce the original Writ of Execution, it would seem impossible to maintain the validity of "Appendix A" — the linchpin of the entire enforcement action — as an accurate representation of the Judgment and the Writ. Respondents nevertheless resisted efforts to produce the Writ or to allow this court to weigh its considerable relevance. In their Opposition to Appellees' Motion to Supplement the Record, Respondents reiterated the narrow jurisdictional basis of their appeal, but that argument was again made in conjunction with a defense of "Appendix A," the spurious document identified as the Writ.

This recap of the red flags Respondents ignored in their two-year quest to enforce the $489 million Nicaraguan Judgment underlines the central difficulty in assessing Respondents' culpability and therefore the appropriate discipline. The ABA *Standards* emphasize the lawyer's mental state. Respondents' states of mind clearly evolved over time. Respondents were obviously more culpable in opposing Appellees' Motion to Supplement the Record than they were at earlier stages in the proceedings, although many of the events that occurred in district court should have put them on notice that their position was untenable and that any appeal would be frivolous.

In their proposed stipulation with Professor Little, Respondents accepted only that their behavior was reckless, although

Professor Little noted that in his view, the evidence could support Judge Tashima's characterization of the conduct of Lack, Traina and the junior associate as intentional and knowing. At the subsequent hearing before us, at which they appeared in person, both Lack and Traina strongly disavowed any intent to mislead the court. This position no doubt reflects Respondents' sincere wish that their statements about the Notary Affidavit had been true. Unfortunately, even if Respondents only "chose to state as a fact what was at the best a guess and a hope, [they] engaged in misrepresentation." *In re Curl*, 803 F.2d 1004, 1006 (9th Cir. 1986), *overruled on other grounds*, *Partington v. Gedan*, 923 F.2d 686 (9th Cir. 1991) (en banc).

We have explained why misrepresentation cannot be taken lightly:

> The vice of misrepresentation is not that it is likely to succeed but that it imposes an extra burden on the court. The burden of ascertaining the true state of the record would be intolerable if misrepresentation was common. The court relies on the lawyers before it to state clearly, candidly, and accurately the record as it in fact exists.

*In re Boucher*, 837 F.2d 869, 871 (9th Cir. 1988) (order). We have also held that the court need not find squarely intentional conduct to impose serious discipline pursuant to Rule 46(c) for misrepresentations made to the court. *See DCD Programs, Ltd. v. Leighton*, 846 F.2d 526, 528 (9th Cir. 1988) (order).

The ABA *Standards* provide a range of discipline for misrepresentations to a court, and the degree of discipline depends, in large measure, on the lawyer's mental state:

> **6.11**. Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or

improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

**6.12**. Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

**6.13**. Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

**6.14**. Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.

*Standards*, §§ 6.11-6.14.

On the record before us, the conduct of the various Respondents falls somewhere between *Standards* § 6.12 and § 6.13. As Judge Tashima explained in assessing sanctions under 28 U.S.C. § 1927, all of the Respondents were reckless in failing to verify the truth of the statements made to this court about

the Notary Affidavit and the Judgment it purported to represent. The ABA *Standards* do not, however, recognize the mental state of "recklessness."**4** *Standards* § 6.12 applies where there is actual knowledge that false statements and documents have been submitted to the court, while *Standards* § 6.13 applies where the submission of false statements or documents (and the failure to take remedial action) is the product of negligence.

As Judge Tashima explained, Girardi is in a different position from the other Respondents because he took almost no active part in the actual proceedings to enforce the Nicaraguan Judgment. Girardi's practice of authorizing the Lack firm to sign his name on briefs that turned out to contain falsehoods may raise separate ethical questions, but with respect to the specific misrepresentations identified in the order to show cause, Girardi's proven conduct is at most reckless, and the recklessness inheres in his mode of practice, not in any specific action he took in the enforcement action or the appeal. We will therefore formally reprimand Girardi for his recklessness in determining whether statements or documents central to an action on which his name appears are false.

---

**4**"Recklessness," of course, may have different meanings in different contexts. *See, e.g.*, *Prescod v. AMR, Inc.*, 383 F.3d 861, 870 (9th Cir. 2004) (per curiam) (applying California tort law identifying recklessness where "the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow"); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc) (defining the "recklessness" that constitutes the scienter necessary for a violation of securities law as conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (quotation omitted). In the instant context, recklessness might be defined as a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation.

The three Respondents from the Lack firm cannot, like Girardi, rely on a claim of ignorance. The history of the enforcement action demonstrates the multiple occasions on which they chose to remain willfully blind to the fact that they were making false statements. By the time they appeared in this court, the attempt to salvage their case became indistinguishable from a knowing submission of false documents. Suspension is the appropriate discipline for these Respondents.

The ABA *Standards* set out aggravating and mitigating factors that justify an increase or reduction in the degree of discipline to be imposed. *See Standards* §§ 9.2, 9.3. All of the Respondents have submitted extensive mitigation materials that attest to excellent reputations in the legal community and, for Girardi, Lack and Traina, lengthy records of successful practice, with no prior incidents of discipline. *See Standards* § 9.32(a),(g). Each Respondent has been cooperative throughout disciplinary proceedings, and each states that he is genuinely remorseful. *See Standards* §§ 9.32(e)(*l*). Under the ABA *Standards*, however, substantial legal experience may also be an aggravating factor, because an experienced attorney should know better than to engage in conduct that merits discipline. *See Standards* § 9.22(i).

With respect to Respondents Lack and Traina, we conclude that the mitigating factors can affect only the length of the suspension we impose. Although Lack's involvement in the enforcement proceedings was more long-standing than Traina's, each was specifically responsible for the falsehoods presented to this court. Consequently, each is suspended from the practice of law in this court for six months, effective on the filing date of this order. Fed. R. App. P. 46(c). Respondents Lack and Traina may each file a petition for reinstatement after the period of suspension pursuant to Ninth Circuit Rule 46-2(h). Each shall file the petition using this docket number and include evidence that he is in good standing, with

no discipline pending, in all courts and bars to which he is admitted.

With respect to the third Lack firm Respondent, whom we have identified simply as "the junior associate," we find additional, significant mitigating factors. The ABA *Standards* identify inexperience in the practice of law as a mitigating factor, *see Standards* § 9.32(f), but we are more influenced by his earnest, albeit unsuccessful, effort to persuade his more-experienced colleagues not to continue their frivolous appeal. We will privately reprimand the junior associate for allowing his superiors to overcome his sound instincts and for his role in drafting briefs that contained false statements.

### 4.  *Conclusion*

Respondents in this case have been respected members of the bar, and each has presented significant mitigating evidence. Their conduct in this case, however, cannot be excused on that basis, given their culpability and the substantial injury their conduct caused the opposing parties and this court. We have carefully considered the recommendations of Judge Tashima and Professor Little, who have made our task substantially easier and whose assistance we gratefully acknowledge. We impose discipline as follows:

THOMAS V. GIRARDI is formally reprimanded.

WALTER J. LACK and PAUL A. TRAINA are suspended from practice before the Ninth Circuit for six months.

*So ordered.*

## APPENDIX

THOMAS V. GIRARDI; GIRARDI &
KEESE; WALTER J. LACK; PAUL A.
TRAINA; ENGSTROM, LIPSCOMB &
LACK, et al.
                    *Respondents,*

SONIA EDUARDA FRANCO FRANCO; et
al.,
                    *Plaintiffs-Appellants,*
                    v.

DOW CHEMICAL COMPANY; et al.,
                    *Defendants-Appellees.*

No. 03-57038

DC No.
CV 03-05094 NM

REPORT AND
RECOMMENDATION
OF THE SPECIAL
MASTER
(**AS
CORRECTED**)
(Special Master
Proceedings)

Filed October 7, 2009

TASHIMA, Circuit Judge:

The panel[1] in the underlying appeal issued an order that
Respondents Thomas V. Girardi, Girardi & Keese, Walter J.
Lack, Paul A. Traina, a young associate in the Lack firm, and
Engstrom, Lipscomb & Lack (collectively, "Respondents")
show cause "why it or he should not be required to reimburse
the appellees for fees and expenses incurred in defending this
appeal, and why it or he should not be suspended, disbarred,
or otherwise sanctioned, under Federal Rules of Appellate
Procedure 38 and 46, and 28 U.S.C. § 1912 and § 1927, for
filing a frivolous appeal, falsely stating that the writ of execu-
tion issued by the Nicaraguan court named Dole Food Com-
pany, Inc. as a judgment debtor, falsely stating that the writ

---

[1]Kozinski, C.J., Reinhardt, and Berzon, JJ.

corrected mistakes in the judgment, and falsely stating that the notary affidavit constituted an accurate translation of the writ." Thereafter, the panel appointed a special master to conduct such proceedings as may be required and to make a report and recommendation to the panel whether sanctions and/or discipline should be imposed and, if so, what those sanctions and disciplinary actions should be.[2] After extensive pre-hearing proceedings and discovery, the Special Master held a five-day evidentiary hearing, which ended on October 25, 2007. This is the Special Master's Report and Recommendation to the panel.

### PROCEDURAL AND FACTUAL BACKGROUND

Based on the record in these proceedings, the Special Master makes the following findings of fact:[3]

Thomas V. Girardi and Walter J. Lack are Los Angeles-based lawyers who have known each other for 30 years and have practiced law together for 25 years. Tr. 417:25-18:2.[4]

---

[2]Pursuant to the Special Master's Order filed on October 17, 2006 (the "Bifurcation Order"), this Report and Recommendation does not address issues relating to discipline under Rule 46. The Bifurcation Order provides that "issues related *solely* to discipline" will be bifurcated and addressed at a later time. Bifurcation was ordered in response to Respondents' motions to disqualify Defendants from participating in these Special Master Proceedings. In those motions, Respondents contended that permitting Defendants to participate in the Special Master Proceedings would violate their right to a disinterested prosecutor, right to a full and fair hearing, and their clients' (*i.e.*, the plaintiffs in *Franco*) interest in confidentiality. The Bifurcation Order was issued to protect those interests, which are implicated more with respect to potential discipline than with Defendants' motion for sanctions, while, at the same time, recognizing Defendants' right to participate in prosecuting their motion for sanctions.

[3]Fed. R. Civ. P. 52(a) recognizes the sufficiency of findings of fact in narrative form, *i.e.*, which appear in a "memorandum of decision filed by the court."

[4]"Tr." refers to the Reporter's Transcript of the evidentiary hearing held in October 2007.

They have worked together on nearly 80 cases, including representing the plaintiffs in the high-profile case against Pacific Gas & Electric Co. (the so-called Erin Brockovich case), representing California energy rate-payers in the *Sempra Energy* case, and serving as plaintiffs' nationwide coordinating counsel in the *Vioxx* litigation. Tr. 420:21-21:14. They are highly experienced and highly successful practitioners.

Typically, in the cases they take on jointly, Girardi and Lack divide responsibilities between their respective law firms, Girardi & Keese (the "Girardi Firm") and Engstrom, Lipscomb & Lack (the "Lack Firm"). Tr. 422:14-23:8. In some cases, the Girardi Firm has the primary responsibility; in others, the Lack Firm has the primary responsibility. Tr. 422:14-:21. On November 13, 2000, Lack and Girardi agreed to engage in one such legal joint venture, signing a Master Fee Agreement with the Nicaraguan law firm of Ojeda Gutierrez and Espinoza (the "Ojeda Firm") to represent Nicaraguan claimants in DBCP[5] litigation.[6] TE15[7] Lack and the Lack Firm would have "complete responsibility for the complaint and all other filings in the case." Girardi Post-Hearing Brief 10: *see also* Tr. 96:16-97:6 ("I [Lack] was ultimately

---

[5]As Chief Judge Kozinski has described it:

> Dibromochlorpropane [DBCP] is a powerful pesticide. Tough on pests, it's no friend to humans either. Absorbed by the skin or inhaled, it's alleged to cause sterility, testicular atrophy, miscarriages, liver damage, cancer, and other ailments that you wouldn't wish on anyone. Originally manufactured by Dow Chemical and Shell Oil, the pesticide was banned from general use in the United States by the Environmental Protection Agency in 1979. But the chemical companies continued to distribute it to fruit companies in developing nations.

*Patrickson v. Dole Food Co.*, 251 F.3d 795, 798 (9th Cir. 2001).

[6]Before signing the agreement, Lack and Girardi traveled to Nicaragua, to meet with members of the Ojeda Firm. Tr. 427:19-428:6.

[7]"TE" refers to Trial Exhibits introduced into evidence at the evidentiary hearing.

responsible for everything that was filed in this case, including at the appellate level.").

## I. THE NICARAGUAN PROCEEDINGS

In September 2001, Sonia Eduarda Franco and 465 other Nicaraguan plaintiffs sued several American companies for injuries allegedly caused by the companies' use of DBCP on banana plantations in Nicaragua. TE-5-112 to -117 (Spanish); TE 5-134 to -165 (English). Lack coordinated with the Nicaraguan counsel, directing them "as to who [Lack] knew, based upon our other pending litigation around the world, the proper party defendants were." Tr. 103:24-104:3. To Lack, the proper defendants were five in number: Dole Food Company, Shell Oil Company, Shell Chemical Company, Dow Chemical Company, and Standard Fruit Company. Tr. 104:6-05:2. The Nicaraguan complaint, however, named as defendants Dole Food *Corporation* and Shell *Oil* Company, but not Dole Food *Company* or Shell *Chemical* Company. TE 5-117 (Spanish); TE 5-140 (English).[8] While the Nicaraguan complaint mentions "Dole Food Company," it lists "Dole Food Corporation," and not "Dole Food Company" as a defendant in the action. *See* TE 73-044 (Spanish), 73-060 (English) (listing "Dole Food Corporation Inc. domiciled at 331364 Oak Crest Drive, Westlake, California 91361-4313, USA" as a defendant); TE 73-043 (Spanish), 73-057 (English) (stating that "[i]n mid-1979, . . . Dole Food Co Inc.[, among others] purchased DBCP with the objective of using it in Nicaragua").

Facing service of a complaint that listed Dole Food Corporation as a defendant, Dole Food Company authorized Dr. Roberto Arguello Hurtado, Dole Food Company's Nicaraguan counsel, to appear in the Nicaraguan proceeding on behalf of Dole Fresh Fruit Company, a Dole entity. *See* Tr. 306:6-09:4. Because Plaintiffs believed that Dole Fresh Fruit

---

[8]Dole Food Corporation does not exist. TE 5-166; TE 6-003; Tr. 294:19-:23.

Company did not operate in Nicaragua when the banana plantations were in operation, Angel Espinoza,[9] the Nicaraguan lawyer for Plaintiffs, moved, on October 25, 2002, to exclude Dole Fresh Fruit Company from the proceedings, *see* Espinoza Dep. 68:12-70:1, which the judge granted, *see* TE 334 (granting the motion and stating that Dole Fresh Fruit Company is "not . . . a party to this action").

Realizing the problem with the complaint, Espinoza petitioned the Nicaraguan court on November 12, 2002, to change the names of Defendants from Dole Food Corporation and Shell Oil Company to Dole Food Company and Shell Chemical Company. TE 122-04 (English), 122-01 (Spanish). The Nicaraguan judge never ruled on that petition.[10] *See* Espinoza Dep. 198:1-:7.

Following the court's exclusion of Dole Fresh Fruit Company from the case, Dole Food Company authorized Dr. Hurtado, to appear on behalf of Dole Food Company. Tr. 317:11-:15, 318:8-:13. Dr. Hurtado represented to the Nicaraguan court that Dole Fresh Fruit Company was confused by the initial complaint, continued to be concerned that Plaintiffs failure to sue the right person "could lead to injuries to its rights," and therefore, Dr. Hurtado sought to "APPEAR ON BEHALF OF [HIS] PRINCIPAL, *DOLE FOOD COMPANY*, TO RATIFY ALL ACTIONS OF *DOLE FRESH FRUIT COMPANY* IN THE CLAIM FILED AND NOTIFIED TO *DOLE FOOD CORPORATION, INC*." TE 174-04 to -05

---

[9]Angel Espinoza was the "main" lawyer at the Ojeda Firm handling the *Franco* case. The lawyers at the Lack Firm, however, never spoke with him, instead communicating only with Walter Gutierrez, the nonlawyer-administrator of the Ojeda Firm. TE 15; Gutierrez Dep. 24:5-:11; Traina Dep. 72:16-73:9; Assoc. Dep. 18:12-:24, 71:6-:17; Espinoza Dep. 23:8-:12.

[10]Nor are any responses to the petition part of the Nicaraguan court record. *See* TE 705 (DVD copy of complete Nicaraguan court record). It should be noted, however, that several pages are missing from the record. *See* TE 705E.10.

(English) (emphasis in translation reflects emphasis in original); *see also* TE 174-01 to -03 (Spanish).[11] Moreover, Dr. Hurtado requested that the court "DECLARE AT THIS PROCEEDING WHETHER DOLE FOOD COMPANY IS THE DEFENDANT COMPANY." TE 174-06 (English) (emphasis in the original).

In order to appear in a DBCP lawsuit in Nicaragua, Nicaraguan Law 364 requires that a defendant post a US $100,000 bond, which Dole Fresh Fruit Company did before Dr. Hurtado appeared on behalf of that entity. *See* TE 332-01 to -05. Dole Food Company, however, did not want to post an additional $100,000 to appear as Dole Food Company;[12]

---

[11]Respondents Lack, Traina, and the young associate contend that Dr. Hurtado represented to the Nicaraguan court that Dole Food Corporation is a subsidiary of Dole Food Company. *See* Lack Post-Hearing Brief 10. They base this assertion on the following passage from the document which Dr. Hurtado filed, seeking to appear on behalf of Dole Food Company:

> Inasmuch as the company on behalf of which I am acting today, DOLE FOOD COMPANY, has been notified of other claims by this office, although seemingly brought also against DOLE FOOD CORPORATION INC., MY PRINCIPAL IS ALARMED BY THE FACT THAT SUCH CONFUSION, CREATED BY CLAIMANT, COULD LEAD TO INJURIES TO ITS RIGHTS; NOTWITHSTANDING THE FACT THAT AS DOLE FRESH FRUIT COMPANY DID NOT EXIST AT THE TIME OF THE EVENTS; DOLE FOOD CORPORATION INC. NEVER HAD A PRESENCE OR BUSINESS IN NICARAGUA and, as both companies are subsidiaries and there has been no legal proceeding to declare the illegitimacy of the legal capacity of the power of attorney, as the defendant company never ordered to be heard, pursuant to Article 827 Pr; paragraph two and ample case law, I APPEAR ON BEHALF OF MY PRINCIPAL, *DOLE FOOD COMPANY*, TO RATIFY ALL THE ACTIONS OF *DOLE FRESH FRUIT COMPANY* IN THE CLAIM FILED AND NOTIFIED TO *DOLE FOOD CORPORATION INC.*

TE 174-05.

[12]Michael Carter, General Counsel of Dole Food Company, testified that he did not want to post an additional deposit because he considered the Nicaragua courts to be a "fraudulent legal system." *See* Tr. 338:21-39:3.

instead, on November 13, 2003, Dole Food Company sought to appear under Dole Fresh Fruit Company's $100,000 bond and ratify all acts performed on behalf of Dole Fresh Fruit Company.[13] *See* TE 403-001.

The Nicaraguan court, on November 25, 2002, denied Dole Food Company's intervention because the complaint was "not brought against" Dole Food Company. TE 5-170 (Spanish), 5-175 (English). The Judicial Notice states:

> Having seen the power of attorney filed by Dr. Roberto Arguello Hurtado, of legal age, married, an attorney and of this domicile, whereby he evidences his capacity as general judicial representative of Dole Food Company Inc., and *given that the complaint heard in this case was not brought against this company*, the Court hereby denied legal intervention on the part of Dr. Arguello Hurtado. Furthermore, because this attorney has stated that the complaint may affect the interests of his client, the rights of that client should be exercised through relevant channel.

TE 5-170 (Spanish), 5-175 (English) (emphasis added).[14]

---

[13]Dole Fresh Fruit Company's $100,000 bond was not returned until after the Nicaraguan court issued a judgment. TE 12-037.

[14]Respondents attempt to recast this judicial notice, arguing that despite its plain language, the judge refused Dole Food Company's intervention because it "told Dr. Hurtado to use his rights using proper legal means, depositing the money that serves as a procedural guarantee." Lack Post-Hearing Brief 11. For this notion, Respondents rely on Espinoza's deposition, in which he states:

> My understanding is that the judge denied [Hurtado's] participation because he asked that everything that he had done during the past month as a representative of Dole Fresh Fruit Company be ratified in favor of his new company, Dole Fruit—I beg your pardon—Dole Food Company.

On December 11, 2002, the Nicaraguan court issued a $489 million judgment ("Judgment") against Dole Food Corporation and Shell Oil Company. TE 12-011 (Spanish), 12-031 (English). The Judgment did not mention Shell Chemical Company, nor did it name Dole Food Company as a judgment debtor. Although the Judgment referred to Dole Food Company, it did so only to restate that Dole Food Company was not one of the defendants named in the complaint:

> Doctor ROBERTO ARGUELLO HURTADO, as judicial representative of DOLE FOOD COMPANY appeared, stating that the interests of his client could be affected by the complaint requesting legal intervention. It was denied because his client was not one of the companies named in the complaint, and said attorney was advised to exercise the rights of his client in the appropriate forum.

TE 12-006 (Spanish), 12-026 (English).[15]

Lack learned by January 15, 2003 that Dole Food Company claimed that the Nicaraguan Judgment named Dole Food Corporation, not Dole Food Company. In an email to Gutierrez, Lack stated that the Judgment was "against the wrong entity." TE 43; *see also* TE 19. As Lack put it in his January 15 email[16] to Gutierrez:

---

Espinoza Dep. 70:6-:12. The plain language of the notice, however, states otherwise: Dole Food Company was denied legal intervention not because it attempted to ratify Dole Fresh Fruit Company's actions, but because "the complaint heard in this case was not brought against this company [Dole Food Company]." TE 5-170 (Spanish), 5-175 (English).

[15]Despite the judicial notice and the Judgment which states that Dole Food Company's lawyer's appearance was "denied because his client was not one of the companies named in the complaint," Lack argues that it was a "false representation[ ] that Dole Food Company hadn't been allowed to participate [in the Nicaraguan proceedings]." *See* Lack Br. 12.

[16]Girardi received the email exchange which discussed issues pertaining to naming Dole Food Corporation in the Judgment, initialing the emails as they crossed his desk. Girardi Dep. 111:10-12:4, 121:7-22:1.

I have studied your English translation of the judgment and I am VERY concerned. No U.S. Court could read or understand this translation. You have apparently secured a judgment against Occidental Chemical contrary to our earlier discussions and I can't imagine how this happened after you told me Occidental had been dismissed.

The judgment needs to be against Dole Food Co., the entity that was served. There must be a perfect match between the names of the entities served and the names of the entities against whom judgment has been obtained.[17] If this form of judgment has been submitted to the Supreme Court for certification it must be modified now which might require a meeting with the trial judge to correct "clerical error."

This is a simple legal step that your lawyers should be taking care of. From your email it is apparent that everything has fallen on you to do when the lawyers you are working with really must assist and focus on this important task.

It seems to Tom [Girardi] and I that we should have a meeting[18] in Los Angeles when you return for the Staples Concert. . . . Until then, if our judgments are against the wrong entity Dole will continue to pretend it has nothing to worry about.

TE 43; *see also* TE 19.

---

[17]It is unclear why Lack is so adamant that Dole Food Company was "served" because Dole Food Corporation, and not Dole Food Company, was named in the initial complaint. *See* TE 73-044 (Spanish), 73-060 (English).

[18]Lack testified that he "d[id]n't recall" whether the meeting to discuss the problems with the Judgment took place. Tr. 174:1-:2.

On January 23, 2002, at Espinoza's request, the Nicaragua court issued the "Ejecutoria," or Writ of Execution,[19] to Plaintiffs' counsel. *See* TE 13-001 (Spanish), 13-029 (English). The Writ,[20] like the Judgment, named Dole Food Corporation and Shell Oil Company as judgment debtors, TE 13-016 (Spanish), 13-045 (English), and stated that "HURTADO, as judicial representative of DOLE FOOD COMPANY appeared, stating that the interests of his client could be affected by the complaint requesting legal intervention. It was denied because his client was not one of the companies named in the complaint," TE 13-038 (English).

On January 27, 2003, Gutierrez notified Lack and Girardi by email that he "had arrived back in the US," and that he would like to meet with them to discuss, among other things, the "[a]ctual correction [*sic*] translation of the judgment and execution thereof[.]" TE 131-001. Lack annotated, in his own handwriting, his copy of the email, noting that there was a "Meeting w/ W.G. & TVG — discussed all issues : 2 hrs. 1/28 5:00PM — Principe [*sic*]." *Id.*; Tr. 177:17-78:24. Lack admits that a meeting took place, that Girardi attended the meeting,[21] and that the items on the agenda were discussed, including the original Judgment and the writ of execution, but he claims that he never saw the actual Writ until 2005, *see* Tr. 176:21-80:19; although his memory of the meeting was spotty, *see id.*[22]

---

[19]"Ejecutoria" mean Writ of Execution. *See* Espinoza Dep. 84:20-:22.

[20]Judge Benavente signed both the Writ, *see* TE 13-026, and the Judgment, *see* TE 12-017.

[21]In a later memo, Gutierrez referred to Girardi's participation at the meeting, stating that "[l]ike Mr. Girardi so wisely stated at our last meeting ' . . . defendants know one these days we are going to get it right'— and we will." TE 024-003.

[22]On January 31, 2003, Lack and Girardi met with Dole Food Company representatives "to discuss a possible settlement of claims pending in Nicaragua, which included the Franco action." TE 173.

In preparation for another meeting, on March 18, 2003, Gutierrez faxed to Lack and Girardi a document Gutierrez characterized as "[his] report before our meeting[.]" TE 24-001. In it, he reported:

> I have brought back translated copies of the motions by Attorney Espinoza requesting the amendments to our complaints, correcting the names of the named defendants to Shell Chemical Co., and Dole Food Co., Inc. Dow Chemical Co. has been correctly filed and served. The amendment request have been approved, I have the translated version, and all complaints have been corrected.

> We will have to reserve the defendants, although it will be costly, it can be done expeditiously since all complaints will be served at once. There will be no grounds for the defendants to argue improper service.

> I also brought correctly translated copies of the final judgment and the certified writ of execution. To my complete amazement and disbelief I was made aware of a grave mistake that I had been led to assume, due to improper pronunciation of what was required to execute the judgment in the US.

> I was told by our attorneys that we needed an "ese cuatro" which translates into English as an "S4". Therefore, I assumed (my big mistake) that an S4 was a required form that had to be filed with the Supreme Court before the default judgment could be sent to the US (to execute). I have spent the last three months trying to locate this form S4, because I wanted to be ready when the defendants' last appeal was dismissed.

> A week ago I discovered that the word is not "ese cuatro" but "exequatur" from the Latin word "exse-

quatur", which means to execute. Therefore, it
means the writ of execution, which I have had for
the past month in my possession with all the other
prerequisites required by law to execute the default
judgment in the US.

I have brought the certified copy of the writ of exe-
cution correctly translated into English, and ready
for execution.

TE 24-001 to -002.

Two days after transmission of this "report," March, 20,
2003, Gutierrez brought the Writ to Los Angeles.[23] *See*
Gutierrez Dep. 143:5-:9 ("I don't know if it was in April,
May, I don't recall the date—I took it back with me to the
United States to be—okay."). There, the Nicaraguan Consul-
ate authenticated the Writ. TE 13-028 (Spanish), 13-055
(English). Gutierrez, according to his testimony, then took the
Writ back with him to Nicaragua. Gutierrez Dep. 144:6-:13.

Back in Nicaragua, Gutierrez claims to have prepared cop-
ies of the Writ, including a translation, and sent them to Lack
and Girardi. As noted in an email he sent to Lack and Girardi
on March 28, 2003:

I just completed getting the English translated copies
of the writ of execution certified by the Supreme
Court and the Ministry of the Exterior. One of the
copies is a straight translation, and the other copy is
a direct order from the District Court.[24]

---

[23]Lack and Gutierrez agree that Lack never asked to see the Writ. *See*
Tr. 176:21-80:19; Gutierrez Dep. 144:19-:20.

[24]Gutierrez was referring to the January 2003 Writ when he stated "the
other copy is a direct order from the District Court." Gutierrez Dep.
224:15-25:5.

> Use the copy that you feel is appropriate. I am sending them via UPS today, and you should receive them on Monday (3/31) no later than Tuesday (4/1).
>
> I told the banana workers that the lawsuit should be filed by Friday 4/11.
>
> If there are any issues you want me to address that I might have overlooked please let me know.

TE 25-001.

Gutierrez followed this up with another email to Lack and Girardi on April 1, 2003:

> I would like to know whether you have received the UPS package today (the certified copy of the writ of execution)?
>
> I have a meeting this Sunday, 4/6 with approximately 2,000 of our clients. I would like to give them a time that the lawsuit will be filed in the US. Initially I estimated that it would be 4/11.
>
> If you could please verify before my meeting on Sunday if that is an accurate date, I would appreciate it.

TE 134-001.

Gutierrez followed this with yet another email to Lack and Girardi on April 2, 2003, which evinces an understanding on Gutierrez's part that Lack and Girardi had received the package containing the Writ:

> Since you received the certified copies of the writ of execution, please let me know your plans before my meeting on Sunday 4/6 with our clients.

If you have any questions please call me or e-mail me.

TE 46-001.

Despite admitting that he received the emails, and despite testifying that he never responded to the emails, Lack contends that he never received the Writ, claiming that he "had our Spanish-speaking law clerk call [Gutierrez] and tell him, 'We don't know what you are talking about. Nothing came here.' " Tr. 116:21-17:16, 183:16-:22, 197:7-:9.

Lack further testified that he believed that Gutierrez was essentially acting out an email ruse: Lack contends that Gutierrez did not send the Writ, because "he was getting extreme pressure from the Union in Nicaragua who knew he had obtained a judgment, and so he was able to show them these e-mails and say it's the lawyers in United States that are slowing everything up. But I had not yet received the translation." Tr. 117:20-:25.

Thus, there are only one of two conclusions to be drawn: either Lack received the Writ in 2003—long before 2005, the year he claims to have first seen the Writ—or, Lack learned in 2003 that Gutierrez would create an elaborate deception in order to shield himself from pressure.

On April 18, 2003, Peter M. Schwartz,[25] emailed Lack:

commend[ing] Alex Gutierrez, [Lack's bilingual paralegal, (not to be confused with Walter Gutierrez, the nonlawyer administrator of the Ojeda Firm)] on . . .

---

[25]Peter M. Schwartz, a California lawyer and solo practitioner, considered himself the "referring attorney," serving as the "primary liaison with the Nicaraguan law firm" and the Lack and Girardi Firms. *See* Schwartz Dep. 44:18-:24. Gutierrez cc'd Schwartz on his emails to Lack and Girardi.

his attention to detail required to ferret out both major and minor inconsistencies between the certified translation of the judgment, and the materials provided by Walter Gutierrez.

TE 29. Schwartz continued:

I have been assured by Walter Gutierrez that most of the errors are clerical in nature, and were limited to the certified translation, are being rectified, with the issuance of a new certified translation that he will forward after the Easter break.[26]

TE 29. This, of course, suggests that Lack, or at least the Lack Firm, had possession of the Judgment and a certified translation, and that "errors" were known to the Lack Firm.

On April 24, 2003, a Nicaraguan notary public, Miguel Angel Caceres Palacios,[27] issued the Notary Affidavit. TE 14; Caceres Dep. 109:10-10:14. The Notary Affidavit is entitled "Testimonio," and begins (as translated into English):

AFFIDAVIT

PUBLIC RECORD NUMBER SIXTY, (60) (TRANSLATION OF WRIT OF EXECUTION INTO THE ENGLISH LANGUAGE). In the city of Managua, at eight o'clock in the morning on the twenty-third day of April of the year two thousand three, before me, Miguel Angel Caceres Palacios, an attorney and Notary Public of the Republic of Nicaragua, duly authorized by the Honorable Supreme

---

[26]Lack testified that he also did not ask Schwartz about the documents to which Schwartz refers. Tr. 199:24-200:8.

[27]Mr. Caceres is also an attorney and once served as a judge. *See* Caceres Dep. 10:11-12:18. He was not, however, a judge when he issued the Notary Affidavit. *Id.*

Court to practice as a Notary for a five-year period
that expires on the fifth of September of two thou-
sand three, appeared Angel Salvador Espinoza
Guerra, who is of legal age, single, attorney, domi-
ciled in this city and identified with Identification
Document Number [illegible], and Jorge Nicolas
Ballesteros Castillo, who is of legal age, married, a
translator, domiciled in this city and identified with
Identification Number 001-061260-0034U. I certify
that the persons appearing are known to me person-
ally and, in my opinion, have the civil capacity nec-
essary to bind themselves and to contract, and
especially for the execution of this act, in which they
act in their own names and on their own behalf. The
former presented to me a document that literally
reads in its entirety . . . .

TE 14-001 (Spanish), 5-359 (English).

The Notary Affidavit, therefore, purports to provide an
exact transcription of the Writ. The Notary Affidavit, how-
ever, is not an exact transcription. Where the names "Dole
Food Corporation" and "Shell Oil Company" appear in the
Writ, the Notary Affidavit substitutes "Dole Food Company"
and "Shell Chemical Company." *Compare* TE 13-016, *with*
TE 14-016. Because of the substitution of Dole Food Com-
pany for Dole Food Corporation, the Notary Affidavit states
both that Dole Food Company is a judgment debtor, *see e.g.*,
TE 02-033, *and* that Dole Food Company was denied the
opportunity to appear because it was "not one of the compa-
nies sued," TE 02-028.

II.   THE STATE COURT AND DISTRICT COURT PROCEEDINGS

Armed with the Notary Affidavit,[28] on May 14, 2003, Lack

---

[28]Lack obtained the Notary Affidavit from Gutierrez sometime in "late
April or May" 2003. Lack Dep. 39:25-40:19, 118:6-:9.

and Girardi[29] filed an enforcement action in Los Angeles Superior Court to enforce the foreign judgment. *See* TE 2. The complaint contained a number of material omissions and inaccuracies.

First, the complaint attached the Notary Affidavit as Appendix A. Appendix A, however, does not contain the entire text of the Notary Affidavit; rather, the entire introductory paragraph, quoted above, is excised from the version found in Appendix A. *See supra* p. 10024; TE 14-001 (Spanish), 5-359 (English). The missing introductory paragraph explicitly states that the document is (1) an affidavit by a notary public, (2) a transcription of the Writ, and (3) was issued on April 23, 2003. *Id.* Instead, the complaint states that Appendix A is the Writ itself. *See* TE 2-012 to -13 ("On December 11, 2002 a final judgment was entered by the Third Civil District Court for Managua, Nicaragua. Subsequently, on January 23, 2003, a Writ of Execution issued which incorporated the judgment *in haec verba*, a copy of which is attached hereto as Appendix 'A.' ").

Second, the complaint states that the Nicaraguan court "entered judgment . . . against all defendants." TE 2-010. Lack, however, knew that the judgment named Dole Food Corporation and not Dole Food Company, *see* TE 43 (saying that he was "very concerned" about the Judgment and that it must name "Dole Food Company") ; *see also* TE 19:001 (same); Tr. 174:21-75:7 (testifying that he told Gutierrez to fix the judgment), and Lack never saw a judgment naming Dole Food Company, *see* Tr. 175:24-76:13. Lack also testified that

---

[29]Girardi's signature appears on the complaint, *see* TE 2-015, although he may have signed or authorized Lack to sign it for him, *see* Girardi Dep. 152:18-:20. Moreover, Girardi testified that he signed the complaint without reading it, Tr. 431:4-:7, and that he is not sure that he understood that the complaint commenced an action to enforce a foreign judgment, Tr. 448:17-49:10. To Girardi, Lack had primary responsibility for the *Franco* case; therefore, he did not concern himself with the details of that litigation.

Gutierrez never told him that the name changes appearing in the Notary Affidavit were approved by the court. *See* Lack Dep. 158:11-:20.**30** Indeed, the express terms of the Notary Affidavit state that it was issued by a notary public in the presence of Plaintiffs' lawyers. *See supra* pp. 10027-28. As noted, however, those express terms were omitted from Appendix A.

Third, the complaint states that "[t]he original certified copy of the Writ of Execution is within the custody of Plaintiffs' counsel[.]" TE 02-013. Lack, however, repeatedly testified that he never saw the Writ. *See, e.g.*, Tr. 176:11-:13. Indeed, Gutierrez testified that he took the Writ, after it was issued, "back to Nicaragua and showed it to the banana workers." Gutierrez Dep. 144:12-:13.

On June 25, 2003, at Defendants' request, Lack sent defense counsel a complete copy of the Notary Affidavit. *See* TE 352-001. As Lack stated in his letter:

> Pursuant to your request, I'm transmitting herewith an exact photocopy of what I refer to as a Judgment and Writ of Execution. Apparently, we deleted certain portions of the Spanish part since they were deemed superfluous to the Judgement [*sic*]. I believe that this is everything you have asked for.

*Id.*

On July 17, 2003, then possessing a copy of the complete Notary Affidavit, Dow Chemical Company ("Dow") and Shell Chemical Company ("Shell") removed the action to federal court. *See* TE 005-001 to -027. In their notice of removal, Dow and Shell argued that although Dole Food Company, a California corporation, was a local defendant, there, neverthe-

---

**30**Lack also testified that Gutierrez provided "no explanation [as to] how it got from Shell Oil to Shell Chemical. None." Tr. 204:23-05:2.

less, was complete diversity because Dole Food Company was fraudulently joined. *See* TE 005-014 ("Under § 1441(b), removal on the basis of diversity is unavailable if one of the properly joined defendants 'is a citizen of the State in which such action is brought.' If a party is fraudulently joined, however, its presence as a resident defendant is ignored for removal purposes.' "). The removal notice identified, *in July 2003*, all of the problems with Respondents' actions: it states that (1) Dole Food Company was incorrectly substituted for Dole Food Corporation, *see* TE 05-015 ¶ 13; (2) Dole Food Company was denied intervention in the Nicaraguan proceeding because it was not a party, *see* TE 005-018 ¶ 19; and (3) Appendix A is not the Writ, but is a "facially inaccurate *post hoc* recitation of the judgment, incorporated within a transcribed and translated version of a writ of execution, all contained in a form secured *ex parte* from a notary public," TE 05-021 ¶ 23.

Moreover, attached to the Notice of Removal were originals and English translations of the Judgment itself, *see* TE 5-203 to -220 (Spanish), 5-222 to -240 (English), the complete Notary Affidavit, *see* TE 5-306 to -356, the November 25, 2002 Judicial Notice which states that "the complaint heard in this case was not brought against" Dole Food Company, *see* TE 5-170 (Spanish), 5-175 (English), and a copy of one of the Nicaraguan complaints, which lists Dole Food Corporation, but not Dole Food Company, as a defendant, *see* TE 5-112 to -130 (Spanish), 5-135 to -160 (English).

On July 24, 2003, Defendants moved to dismiss the complaint. *See* TE 72. The motion to dismiss, like the notice of removal, pointed out that the Notary Affidavit attached as Appendix A was not the Writ,[31] that Dole Food Company and

---

[31]As Defendants note in their motion to dismiss:

[W]hat the plaintiffs attach as Appendix A—and what they now ask an American court to "recognize"—is at least four steps

Shell Chemical Company were substituted for Dole Food Corporation and Shell Oil Company, respectively, *see* TE 72-014 to -016, and that both the Judgment and the Notary Affidavit stated that Dole Food Company was denied legal intervention because it "was not one of the companies named in the complaint," *see* TE 179-008.

On August 8, 2003, Gutierrez emailed Lack and Girardi concerning the actual names on the Judgment:

> I received a call from Betsy [Crooke, an attorney at the Lack Firm] yesterday. She needed to verify the actual name on the judgment, dates, and addresses of each defendant. I am currently preparing a request from [*sic*] the court to issue a signed and sealed affidavit by judge Vida Benavente, of the 3rd District Court in Managua giving all that information.

TE 708.21.

On August 11, 2003, the clerks of the Nicaraguan court issued an order confirming that Dole Food Corporation and Shell Oil Company were the judgment debtors:

> The undersigned court clerks and records official of the Third Civil District Court of Managua certify that a judgment was issued at ten a.m. on December

---

removed from the actual Judgment. It is a portion of an affidavit signed by a notary public, . . . , in the presence of the plaintiffs' lead Nicaraguan attorney, . . . , and the court-appointed translator[.]

TE 72-014. And, as Defendants correctly point out in a footnote:

This is plain from the first page of the *complete* Notary Affidavit that the Plaintiffs did not provide to the California court, but which was later supplied to the defendants upon request.

TE 72-014 to -015 n.16.

eleventh, two thousand two, in the cases . . . which
have been consolidated in File No. 1159-01. The
judgment awarded payment of damages totaling
FOUR HUNDRED EIGHTY-NINE MILLION
FOUR HUNDRED THOUSAND DOLLARS NET
(USD $ 489,400,000.00), with the following compa-
nies being liable for the aforementioned payment:
Dow Chemical Company, Shell Oil Company, and
Dole Food Corporation, Inc. . . . . Managua, August
eleventh, two thousand three.

TE 705E.5850 (English); *see also* TE 705S-5794 (Spanish);
Espinoza Dep. 124:16.

Despite this, on August 14, 2003, Plaintiffs moved to
remand the action to state court and filed a reply to Defen-
dants' motion to dismiss. *See* TE 73. In their Motion to
Remand, Plaintiffs, as they did in the Complaint, falsely assert
that the Complaint attaches "[t]he actual Judgment/Writ of
Execution which names Dole Food Company Inc. as a party,"[32]
TE 73-007; *see also* TE 73-016, and that the Writ named Dole
Food Company and Shell Chemical as judgment debtors, *see*
TE 73-016. Plaintiffs' opposition and reply briefs, like the
motion to remand, repeat these false statements. *See* 74-026
("Plaintiffs attached the Writ of Execution to the Complaint.
See Complaint, Appendix A."); TE 74-012 ("As recited in the
Writ of Execution, judgment was entered against Shell Chem-
ical."); TE 75-011 ("The Writ of Execution properly corrected
the name of Dole [Food Company] to reflect that they were
the entity whom the Judgment could be enforced against.");
*see also* TE 075-004 (referring to "Dole" as "Dole Food Com-
pany").

Although Lack's signature appeared on Plaintiffs' Motion
to Remand, Opposition Brief to Defendants' Motion to Dis-

---

[32]The motion to remand, however, admits that "Dole Food Corporation
is the entity named in the Judgment." *See* TE 73-016.

miss, and Reply to Defendants' Opposition to Plaintiffs' Motion to Remand, the "primary responsibility" for preparing these briefs fell on Respondent Paul Traina.[33] *See* Traina Dep. 19:23-20:2; *see also* TE 057-008 ("I am the person who drafted all of the pleadings in the action giving rise to the [*Franco*] appeal and am the attorney most knowledgeable from my office regarding the issues on appeal."). In preparing to draft the briefs, Traina "read the entire contents of the removal papers," the exhibits that were attached to the Notice of Removal, and the Motions to Dismiss, and reviewed the complaint filed in the California Superior Court. Traina Dep. 18:15-19:12. He did not request the actual Writ from Nicaragua, even though it was always available to him and the other Respondents. Traina Dep. 193:12-94:10; *see also* Tr. 576:20-:23 (testifying that Respondents never asked for the Writ until a court ordered them to produce it). In short, Traina did virtually nothing to investigate and determine the veracity of the statements made in the Complaint, even though the Notary Affidavit, on its face, presents questions as to its authenticity and even though Defendants' central argument called into question the accuracy of the statements made by Respondents in Plaintiffs' Complaint.[34]

Instead, Respondents filed the reply brief, which as noted, repeated the inaccurate statements appearing in the Complaint. To support the inaccurate statements, Respondents attached three declarations to their reply brief: an "expert" declaration from Lorena Centeno, a California lawyer who had graduated from a Nicaraguan law school, a declaration from Orlando Corrales Mejia, a former Vice President of the

---

[33]Although Lack refers to him as a "partner," Traina is, in fact, an employee of the Lack Firm and has worked for it since May 1996. *See* Traina Dep. 9:20-10:18.

[34]Traina never asked Nicaraguan counsel if Appendix A was the Writ, as the Complaint contends, *see* Traina Dep. 69:18-:22, 144:6-:16; *see also* Espinoza Dep. 23:8-:12, nor did he even ask why, assuming that Appendix A was the Writ, it would be titled "Affidavit," *see* Traina Dep. 51:10-:12, 55:13-:15, 68:9-70:22, 146:24-47:3.

Nicaraguan Supreme Court, and a declaration from Espinoza of the Ojeda Firm.

Lorena Centeno graduated from a Nicaraguan law school in 1983, but had never practiced law in Nicaragua[35]—following graduation she immediately entered a master's program in business administration, and then came to Los Angeles in 1985. *See* Centeno Dep. 8:23-9:24. Centeno's opinions and conclusions state, in their entirety:

> 9. Under Nicaraguan law, a Judgment is the final document issued by the Court as to legal issues litigated and relief requested. In other words, technicalities, such as spelling or typographical errors are often the subject of later corrections which might appear in the Writ of Execution. The purpose of the Writ of Execution is technical or simply to order enforcement of the Judgment.

> 10. In the instant case, the discrepancy is between the name Dole Food Corporation in the Judgment and Dole Food Company, Inc., which is the legal entity in the United States which appears on the Writ of Execution. Nicaraguan Commercial Law is old and does not mention "corporation" as a separate and distinct commercial entity. More specifically, the use of the word "company" and "corporation" pursuant to Nicaraguan law, mean the same legal entity. Thus, changing the name "corporation" to "company" would be viewed as a minor technicality and consistent with Nicaraguan law.

> 11. The Writ of Execution usually contain [*sic*] the

---

[35]She had worked as a legal intern in Nicaragua and twice appeared in a Nicaraguan court to "defend the national army of Somoza after they were overthrown." Such representation, however, was "mandatory," and she was not compensated for that representation. Centeno Dep. 14:3-15:8.

Judgment verbatim but basically acts as a certifica-
tion of a firm Judgment.

TE 75-043 to -44.

In forming her opinions and conclusions, Centeno declared
that she had reviewed the Nicaraguan judgment, the Writ, the
Complaint, the Motion to Remand, and Defendants' Opposi-
tion to Motion to Remand. *See* TE 75-043. In fact, she did not
review any of Defendants' motions or the complete Notary
Affidavit. *See* Centeno Dep. 95:1-96:15, 98:15-:24; TE 84.
Traina also did not ask her whether Appendix A was the Writ
of Execution. *See* Centeno Dep. 57:14-58:18; Traina Dep.
114. Indeed, when she was deposed and shown the Notary
Affidavit, she testified that the Notary Affidavit was not a
court-issued document. Centeno Dep. 95:1-96:9.

The Centeno declaration was drafted by the Lack Firm,
which faxed it and a few Nicaraguan documents to Centeno
only two days before the declaration was to be filed. *See* Tr.
567:6-:15 (noting that the initial draft was sent on September
17 and the reply brief including the declaration was filed on
September 19); TE 82 (copy of the initial draft marked-up
with Centeno's handwritten changes).

On September 18, 2003, the day before her declaration was
filed, Centeno emailed Traina telling him that his draft decla-
ration was "inaccurate." TE 77-001. Specifically, paragraphs
5 and 6 of the draft stated that "plaintiffs motion sought to
have Dole Food Corporation changed to reflect the names of
the true defendant, Dole Food Company, Inc. The Nicaraguan
court ruled on plaintiffs' motion April 9, 2003. The court
granted the motion and issued an order allowing the typo-
graphical errors to be corrected." TE 82-006. Centeno, in her
email, told Traina that those paragraphs and the attached
motion "CONFUSES THE PROCESS," because the motion,
as she read it, "means that they are [attempting to] amend[ ]
the original Complaint." TE 77-001. Centeno began her email

stating that "[i]t is too bad I has [*sic*] such a short notice to research this better," TE 077-001, and closes with "[a]lso, I have not read the Judgment and the Writ of Execution. With the documents I have seen, the declaration is inaccurate. If you could get more time to file this Declaration I believe it would be best to review the entire file," TE 077-002.

Traina's second expert declaration, submitted on September 19, 2003, was purportedly from Orlando Corrales Mejia,[36] "an attorney and Notary Public in the city of Managua," who claimed to "have personal, first-hand knowledge of the facts set forth herein[.]" *See* TE 102 (Mejia Declaration). The Mejia Declaration's Opinions and Conclusions provided Plaintiffs with everything for which they could hope:

> 4. I have agreed to testify on behalf of the Plaintiffs in the above entitled case for the purpose of supplying an expert opinion in relation to Nicaraguan law. I know the case in detail. After review of all the documents in the court file and after reviewing the Judgment and Writ of Execution, and based on my experience and familiarity with Nicaraguan law, I can affirm and conclude the following:
>
> (a) That in the Judgment an error was committed regarding the spelling of the defendant's names;
>
> (b) That the Plaintiffs in a timely and legal manner made use of the appropriate remedies to amend said error;
>
> (c) That effectively the Judge of the case, acting in conformity with the law, ordered the corrections to be made with respect to the names of the defendants;

---

[36]Mejia is also a former Vice President of the Nicaraguan Supreme Court, although the "Mejia Declaration" did not so state. Mejia Dep. 49:19-:22. Mejia does not speak English. Mejia Dep. 8:3-:7.

(d) That the Judgment, as a amended [*sic*], is contained in the writ of execution.

(e) That no final and signed Judgment constitutes, in and of itself, the document used to execute the sentence of the Court; and

(f) That it is an indispensable requirement, in order to execute a Judgment, that the Judge or Tribunal issue the respective writ of execution.

TE 102-001--02.

Traina, and not Mejia, however, drafted Paragraph 4, and Traina never spoke with Mejia about the contents of the "Mejia Declaration." *See* Traina Dep. 126:25-28:10. Traina testified at his deposition:

Q. Now, you said previously, I think, that you were the primary attorney who worked with Mr. Mejia to prepare his Declaration?

A. That's correct.

Q. Okay. Did you ask Mr. Mejia to opine on the question as to whether the document that was attached as Appendix A to the Complaint was a court-issued Writ of Execution or as defendants claimed a Notary Affidavit?

A. I asked him to opine on the actual opinions. I didn't ask him to opine, quite frankly. This was an expert that Walter Gutierrez had and he said was familiar with the proceedings, and these are the things he said that he could testify to, so it's not that I went out and sought him out because I wouldn't even know how to seek him out. It was somebody that the initial contact had already been made and

was told to me that it's somebody that had knowl-edge regarding the issues as he sets forth in his Dec-laration.

Q. So did you personally have a conversation with Mr. Mejia before—let me ask you this. Who pre-pared the first draft of his Declaration?

A. I prepared the first draft.

Q. Okay. Did you have a conversation with Mr. Mejia before you prepared the first draft of the Dec-laration?

A. I didn't have a conversation directly with him. I had a conversation—a couple of conversations, actu-ally, with Walter Gutierrez, and Walter Gutierrez was on the phone with him. And, they're telling me, both him and Walter Gutierrez, of exactly what hap-pened, what happened down there, and we formu-lated the Declaration, and we sent the Declaration to Mr. Mejia. In fact, I think that Walter Gutierrez took it to him.

. . . .

Q. In paragraph 4-b it states that "the plaintiffs in a timely and legal manner made use of the appropriate remedies to amend said error."

Was that your understanding of the — at the time as to what those appropriate remedies were?

A. My understanding was that they went into court, and that the court allowed them to make these changes, and that these changes were reflected in the Writ of Execution. And what we end up with as the

final document is the Writ of Execution incorporating the judgment.

Q. Did you ask Mr. Mejia whether there was any documentation that would support that assertion?

A. Well, we've already been through that, but the answer to your question is "yes." I mean, I was looking for documentation regarding that issue.

. . . .

Q. You asked Mr. Gutierrez—did you ask Mr. Gutierrez to ask Mr. Mejia where there would be documentation?

A. I don't know if I asked Mr. Gutierrez to ask Mr. Mejia. I asked Walter Gutierrez to see if we had that documentation.

Q. Did you ever ask Mr. Mejia specifically either directly or through Mr. Gutierrez whether it was acceptable, you know, or common practice in Nicaragua to change names in a judgment without any written documentation being produced?

A. I didn't ask that question.

. . . .

Q. Did you ever provide Mr. Mejia with a copy of—with a full copy of the Notary Affidavit?

A. I did not.

Q. Do you know if anyone at your firm did?

A. I don't know if anybody at our firm did or not.

Q. Was anybody else at your firm working with Mr. Mejia on this Declaration?

A. No.

Traina Dep. 126:25-31:21.

Mejia, however, testified at his deposition that he first saw the declaration in January 2007 when it was brought to him by Respondents,[37] Mejia Dep. 13:10-:20, that the declaration was "totally" fraudulent, Mejia Dep. 18:12-19:1, that he had no idea as to how his signature and stamp came to appear on the declaration, Mejia Dep. 14:22-15:6, that he never communicated with anyone concerning the *Franco* case, Mejia Dep. 11:20-12:7, 22:5-:11, and that he met Walter Gutierrez for the first time in January 2007, Mejia Dep. 22:12-:17. He also denied being retained by the plaintiffs. Mejia Dep. 11:15-:19. Mejia also testified that shortly after learning of the existence of the declaration, he went to Gutierrez's office to confront Gutierrez; an altercation occurred, where Mejia called Gutierrez a "scoundrel." Mejia Dep. 23:21-24:18. When shown the Notary Affidavit at his deposition and asked if it "is a court-issued document," he said "No. No. No. This is just simply a translation of that document, supposedly." Mejia Dep. 29:2-:6.

Respondents' final declaration, which states that the naming of Dole Food Corporation in the Complaint was "simply a clerical error," was from Espinoza. TE 73-029 ¶ 6. The Declaration also states that Dole Food Company, Inc.'s request to appear was denied as untimely, TE 73-030 ¶ 15, that Dole Food Corporation was erroneously identified in the Judgment, characterizing this as a "typographical error[ ]," TE 73-031 ¶ 17, that the Writ "supercedes the judgment," TE 73-031,

---

[37]According to Mejia, the Lack Firm sent two lawyers, including Elizabeth Crooke, to Nicaragua to confer with him before his deposition. *See* Mejia Dep. 10:7-11:14.

and that the Nicaraguan court used the Writ to correct "certain spelling errors," such as changing "Dole Food Corporation" to "Dole Food Company," TE 73-031 ¶ 21.

Like the other declarations, the Lack Firm drafted this one as well. Traina Dep. 84:23-85:9 ("I believe it was by Stephen Terrell of our office[.]), 105:20-06:4 ("Mr. Espinoza['s declaration], I believe it was myself and Stephen Terrell [who drafted it.]). Traina never spoke with Espinoza about his declaration. *See* Traina Dep. 72:16-73:9 ("I never had any conversations with Nicaraguan counsel. I had all my conversations with Walter Gutierrez[.]"). After it was drafted, the declaration was sent, in English, to Espinoza, and he signed it, accepting the document as drafted, without making any revisions of his own.[38] Espinoza Dep. 138:1-:8.

When Espinoza was deposed, he testified that he was unaware that the declaration stated that the court had corrected "errors" in the Judgment. Espinoza Dep. 146:15-47:5. His testimony conflicted with the declaration in other respects: Espinoza testified that he believed that both the Judgment and Writ of Execution named Dole Food Corporation and Shell Oil Company as judgment debtors, *see* Espinoza Dep. 49:20-52:16 (testifying that he realized at the time that the judgment was issued that it named Dole Food Corporation), 86:21-89:21 (testifying that the Writ of Execution named Dole Food Corporation and Shell Oil Company as the judgment debtors), that the Notary Affidavit is not a court-issued Writ, Espinoza Dep. 86:21-87:16, 97:2-:17, that it was improper for the Notary Affidavit to name judgment debtors different from the Judgment and the Writ, Espinoza Dep. 107:12-108:10, that he did not know who made the change in names in the Notary Affidavit, Espinoza Dep. 123:11-:15, that Respondents never asked him how the name changes in the Notary Affidavit occurred, Espinoza Dep. 124:8-:12, that Judge Benavente, the Nicaraguan judge, named Dole Food

---

[38]Espinoza does not speak or read English. Espinoza Dep. 19:21-20:3.

Corporation in the Judgment and the Writ, Espinoza Dep. 121:12-:14, that the judge never changed the names, that Espinoza never told anyone that the Judge changed the names in the Judgment or the Writ, Espinoza Dep. 121:22-22:7, and that the Nicaraguan court never issued an order naming Dole Food Company or Shell Chemical Company as judgment debtors, Espinoza Dep. 221:11-:21.

On October 16, 2003, District Judge Manella denied Plaintiffs' Motion to Remand, finding the following:

> On December 11, 2002, the Nicaraguan court entered a $489.4 million judgment against four companies Plaintiffs had named in their complaint: "Dow Chemical, also known as Dow Agro Sciences," "Shell Oil Company," "Standard Fruit and Vegetable Co. Inc.," and "Dole Food Corporation Inc." These names appear in English in the Spanish version of the Judgment. Though Plaintiffs seek to enforce this Judgment, they failed to attach a copy to their Complaint. Instead, they attached a "translated version of the Writ of Execution" that allegedly was issued on January 23, 2003. The attached document appears to be an affidavit signed on April 24, 2003 (almost three months after the alleged writ of execution) by Miguel Angel Caceres Palacios, attorney and notary public, at the request and in the presence of Plaintiffs' lead Nicaraguan attorney, Angel Espinoza, and a translator. The notary's signature is certified as authentic by Alfonso Valle Pastora, clerk of the Nicaraguan Supreme Court, followed by the statement that "[n]either the undersigned Clerk nor the Supreme Court is responsible for the contents of the document."

> The Notary Affidavit orders the following four companies to pay the Plaintiffs: "Dow Chemical Company, also known as Dow Agro Sciences, Shell

Chemical Company, Standard Fruit and Vegetables
and Dole Food Company Inc." However, neither
Shell Chemical Company nor Dole Food Company,
Inc. was named in the Judgment. The Notary Affida-
vit also recites facts inconsistent with the naming of
Dole Food Company, Inc. as a party to the underly-
ing action: "Dr. Roberto Arguello Hurtado appeared
in his capacity as legal representative for Dole Food
Company stating that the interests of his client could
be affected by the complaint, and requesting to be
given legal standing, which was denied since his cli-
ent was not one of the companies sued[.]" It also
states that Hurtado was the attorney for "dole [sic]
Food Company, Inc.," "one of the companies that
had not been sued."

TE 006-003 to -004 (internal citations omitted). In granting
the motion, Judge Manella accurately described the situation:
"Plaintiffs attempt to enforce a $489.4 million judgment
against a non-party based on an affidavit that purports to be
a translation of a writ of execution." TE 006-008. The district
court also granted Defendants' Motion to Dismiss, character-
izing the Notary Affidavit as "suspect." TE 48-008.

III.   The Ninth Circuit Proceedings

   On November 20, 2003, Respondents filed a notice of
appeal to the Ninth Circuit. TE 665. They did so without tak-
ing any steps to investigate Defendants' arguments and the
district court's findings and conclusions about the Judgment,
the Writ, and the Notary Affidavit. Traina in his deposition:

Q. Now, when Judge Manella, whether you think it
was appropriate for her to reach the issue or not,
when she did reach the issue and found that the doc-
ument that had been attached to the complaint was
not a Writ of Execution, what did you do, if any-
thing, to investigate whether she was correct or not?

A. I filed an appeal. We filed an appeal. We believed she was wrong. We believed she was wrong because she weighed the evidence. She wasn't supposed to weight the evidence if there's a disputed fact. That's what we did.

Q. I understand the argument you made on appeal that is improper for her to resolve that issue, but that's not what I'm asking you about. What I'm asking you about is the underlying issue as to whether Appendix A was a real Writ of Execution or Notary Affidavit. Did you take any further steps after Judge Manella ruled, any additional steps beyond what you done before to investigate whether Judge Manella was right on the issue.

A. I believed everything that was in the Declarations. They told me it was a Writ of Execution. That's what I believed. I didn't think there needed to be any more steps.

Traina Dep. 142:11-43:12; *see also id.* 144:6-:16 (testifying that Traina consulted with no Nicaraguan lawyers about the validity of the Notary Affidavit). The Declarations of course were drafted by Traina and other lawyers at the Lack Firm, without speaking to two of the declarants. *See supra* pp. 10034-43.

Lack and Traina delegated the duty of drafting the Opening Brief to the young associate,[39] a then-attorney at the Lack

---

[39]The young associate graduated from the University of San Diego Law School in 2001, and began working for the Lack Firm in January 2002. Assoc. Dep. 9:14-:20. By the time he was asked to draft the Opening Brief, he had fewer than 24 months of practice experience, *see id.* 24:12-:13 (testifying that Traina asked him to work on the appeal in December 2003), and no appellate experience: he had never drafted an appellate brief, had never worked on an appeal, nor had he externed or clerked for a judge, *id.* 26:12-:14.

Firm. Traina Dep. 152:10-:12. In preparing the brief, the young associate never reviewed the Writ, *see* Assoc. Dep. 40:19-41:18, the complete Notary Affidavit, *see id.* 74:10-75:8, the Judgment, *see id.* 100:2-:17, nor the November 25, 2002 Judicial Notice denying Dole Food Company's intervention, *see id.* 62:3-:12 (testifying that he "never heard of anything like that until" Defendants' counsel "just brought it up"), and relied on the "expert declarations" without completely understanding them, failing to talk to any of the declarants, *id.* 60:4-61:12.

On April 22, 2004, just days before filing the Opening Brief, Lack and Girardi signed an agreement to enforce, in Venezuela, the same Nicaraguan Judgment at issue in this case. That agreement stated that the Nicaraguan judgment named "Dole Food Corporation, Inc." and "Shell Oil Company":

> This document constitutes an agreement between the Law Offices of Ojeda, Gutierrez, Espinoza y Asociados S.A. represented by Walter A. Gutierrez, hereinafter referred to as "OGESA", Engstrom, Lipscomb, & Lack represented by Walter J. Lack, hereinafter referred to as "Lack", Girardi & Keese represented by Thomas V. Girardi, hereinafter referred to as "Girardi", and Bittan, Salcedo, Manzanilla y Asociados, represented by Jose Salcedo, hereinafter referred to as "Salcedo".

> A judgment for the amount of $489,400,000.00 (four hundred eighty nine million, four hundred thousand dollars) was obtained by "OGESA" against Dole Food Corporation, Inc.; Dow Chemical Company also known as Dow Agro Sciences; and Shell Oil Company.

> The aforementioned judgment was assigned by "OGESA" to "Girardi" and "Lack" for execution in

the United States or any other country where the judgment debtors may hold assets.

Through this agreement the Law Office of "Girardi" and "Lack" associate the firm of "Salcedo" in Caracas, Venezuela for the execution of said judgment against Shell Oil Company exclusively.

TE 030-001.

On April 30, 2004, Respondents[40] filed Appellants' Opening Brief.[41] TE 39-048. That brief repeated false statements made by Respondents before the district court, declaring that Appendix A was the January 2003 Writ, TE 39-011, that the January 2003 Writ names Dole Food Company and Shell Chemical Company as judgment debtors, TE 39-011, 39-020, 39-030, that the "Writ," (which is what Respondents insisted on calling the Notary Affidavit), is "dispositive of the fact that Dole Food Company is a proper defendant," TE 39-36, and that the December 11, 2002 judgment named Dole Food Company and Shell Chemical Company as defendants, TE 39-020, 39-008.

On May 10, 2004, pursuant to Plaintiffs' efforts to enforce the Judgment in Venezuela, Espinoza obtained a second Writ of Execution from the Nicaraguan court. TE 125; Espinoza Dep. 159:5-:14, 159:19-60:22. That Writ again named Dole Food Corporation and Shell Oil Company as the judgment

---

[40]Lack signed the brief and Girardi authorized Lack or Howard Miller, a partner in the Girardi Firm, to sign on his behalf. Girardi Dep. 62:1-62:7. Lack, Traina, the young associate, Girardi, and Miller are listed as Attorneys of Record on the Opening Brief. *See* TE 039-001.

[41]Respondents failed to investigate to determine the veracity of Defendants' arguments and Judge Manella's findings and conclusions: Respondents never even asked their Nicaraguan counsel for the Writ, or a copy, nor did they consult with any of the Nicaraguan lawyers. *See* Espinoza Dep. 23:6-:10, 44:24-45:13, 47:24-48:15; Mejia Dep. 22:5-:11; Lack Dep. 130:5-:15, 188:7-:9; Assoc. Dep. 40:19-41:18; Traina Dep. 69:18-70:22.

debtors: "SONIA EDUARDO FRANCO FRANCO Y
OTROS, CONTRA LOS SOCIEDADES DOW CHEMICAL,
SHELL OIL COMPANY, STANDARD FRUIT AND VEG-
ETABLES CO. INC. Y DOLE FOOD CORPORATION[.]"
TE 125-001.**42**

Defendants filed their Appellees' Brief on June 30, 2004,
again arguing that "it is obvious that plaintiffs have not stated
a cause of action to enforce the Nicaraguan judgment against
Dole Food Company, Inc., for the simple reason that this
entity was not named in the underlying Nicaraguan com-
plaints or judgment and was *affirmatively denied* an opportu-
nity to participate in the Nicaraguan proceedings for just that
reason[.]" TE 60-023 (internal citations omitted).

On August 9, 2004, the young associate sent Traina a
memo:

> As you know, our Reply Brief . . . must be filed on
> August 13th. I am in the process of drafting the
> Reply, which will be completed shortly. Nonethe-
> less, a review of the record, our Opening Brief, and
> defendants' Response Brief leads me to the conclu-

---

**42**Defendants discussed this Writ in their brief to the Ninth Circuit:

Indeed, defendants have recently learned that on May 18,
2004-while this appeal was pending—the Nicaraguan court
granted plaintiff's request for a *new* Nicaraguan "writ of execu-
tion" with respect to the *same* judgment, and that this new writ
lists neither Shell Chemical Company nor Dole Food Company,
Inc. as a liable party, but instead lists the parties named in the
Nicaraguan judgment, Shell Oil Company and the non-existent
Dole Food Corporation, Inc. The fact that plaintiffs continue to
pursue their claims against Dole Food Company, Inc. and Shell
Chemical Company in this Court, knowing full well that the new
writ does not list those companies as liable parties, only under-
scores their attempted manipulation of the judicial process.

TE 060-033.

sion that our chances of succeeding with our Appeal is minimal.

Our appeal is based on the argument that defendants removal of the action violated the "no-local defendant" rule because Dole Food Company, Inc. is headquartered in California. In response, defendants have argued that Dole Food Company, Inc. is a sham defendant that must be disregarded for purposes of the "no-local defendant" rule because Dole Food Company, Inc. was NOT named in the Nicaraguan judgment. Dole is correct. Dole Food "Corporation" was the party named in the Nicaraguan judgment, not Dole Food "Company, Inc." To make matters worse, the judge in the Nicaraguan proceedings clearly stated that Dole Food "Company, Inc." was not a party to the action. Based on these facts, Dole will prevail at the Appellate Court.

If we are unsuccessful in this Appeal, our clients will be exposed to substantial costs. Pursuant to *Federal Rule of Appellate Procedure 38* the Court can award the defendants damages and double costs if an Appeal is determined to be frivolous. Defendants will have a good argument that our Appeal is frivolous based on the claim that since Dole was never named in the Nicaraguan judgment we were aware that Dole was not a proper defendant in our enforcement action. In addition, we run the risk of creating a record before the Ninth Circuit that will be used against us in future attempts to enforce Nicaraguan judgments in California. I recommend that we offer the defendants to dismiss our Appeal in exchange for defendants waiving their costs and feed incurred in the action. Please advise.

TE 32-001.**43**

According to the young associate, Traina discussed the memo with him after discussing it with Lack, and following their conversation, the associate became comfortable that there were good-faith arguments available to Respondents, and proceeded to draft the Reply Brief, *see* Assoc. Dep. 156:8-58:24, which was filed on August 13, 2004. In the Reply Brief, however, the young associate argued that "plaintiffs' Complaint had properly alleged that plaintiffs have a final judgment for a sum of money in their favor against Dole," even though he still had not seen a copy of the Judgment. *Id.* 160:15-61:4.

On April 15, 2005, Respondents delivered the January 2003 Writ to Defendants. TE 688.69-.74. Respondents did so, not voluntarily, but because they were compelled to do so by a discovery order in a related case.**44** *Id.* Upon receiving the Writ, which demonstrates on its face that Plaintiffs had been misrepresenting the contents of the Writ, Defendants moved to supplement the record**45** in this case with the Writ; they also moved for sanctions for (1) filing a frivolous appeal and (2) making false statements. TE 688.

Following receipt of the motion for sanctions, the young

---

**43**The young associate testified in his deposition that he wrote this memo because as he put it: "I would say it's—[the drafting of the memo] was a knee-jerk reaction to how buried and how unhappy I was and how much I was working and everything I had to deal with, so this was my attempt to let Mr. Traina know I didn't want to work on the case. I had too many other things going on." Assoc. Dep. 138:16-:21.

**44**Respondents opposed the discovery request, which resulted in the order in that related case. *See* TE 713.8-.13, 715.5-.9.

**45**Respondents opposed the motion to supplement the record to the Ninth Circuit. *See* TE 26-007, 014 (arguing that the Writ "had no bearing on the issues presented on appeal" and that "expert testimony" made it proper to "rely on [Appendix A].").

associate and Traina drafted a memorandum to Lack and Girardi:

> Defendants have recently moved the Ninth Circuit to supplement the appellate record with a copy of the real January 2003 Writ of Execution issued by the Nicaraguan Court. The January 2003 Writ names Dole Food Corporation—not Dole Food Company, Inc. as a defendant. This January 2003 Writ contradicts the document provided to us by Walter Gutierrez which was attached to our Complaint. The document attached to our Complaint was supposedly a certified translation of the actual Writ, but it changed the name of the defendant from Dole Food Corporation to Dole Food Company, Inc. Throughout this case we have argued that the document provided to us by Walter Gutierrez and attached to our Complaint was an accurate translation of the Writ— the actual Writ proves that in fact the translation was not accurate. Defendants have asked the Ninth Circuit to impose sanctions on us based on the allegation that we have misrepresented to the Court that Dole Food Company, Inc. was named in the Nicaraguan judgment and Writ when in fact it was not.

> We believe that defendants claims in their recent Motion ignores many of the arguments we have raised on appeal. At all times we have admitted that Dole Food Corporation not Dole Food Company, Inc. is named in the Nicaraguan judgment. Our argument on appeal is that in Nicaragua the names Corporation and Company are interchangeable. Thus, the Nicaraguan Court at all times considered Dole Food Company, Inc. a defendant, making the naming of Dole Food Company, Inc. as a judgment-debtor in the certified translation we attached to our Complaint proper. We are in the process of drafting an

opposition to defendants motion to supplement the record.

TE 069-005.

Around July 6, 2005, only a week before oral argument, because of a scheduling conflict, the young associate asked Howard B. Miller,[46] a member of the Girardi Firm, to argue the appeal. Miller Dep. 22:2-:4. Miller, after reviewing the record for only six to eight hours, determined that the appeal should be dismissed, reasoning that the case "involved an issue that I thought called for dismissal of the case because of the way it had been argued and the evidence that was in the record, and I told [Girardi] the case had been argued entirely on the basis of language that was in what I referred to as the original writ naming Dole Food Company. In fact when the original writ had been discovered recently it did not say that, and that since the underlying basis of the appeal constantly repeated and was based on that factor[.]" Miller Dep. 46:3-:12.

Miller called Girardi, recommending that the appeal be dismissed. Tr. 437:9-:16. Miller testified that, from his perspective, it was clear that Girardi had no prior knowledge that the Writ named Dole Food Corporation as the judgment debtor. Miller Dep. 42:13-44:6. Girardi agreed almost immediately that the appeal should be dismissed, *id.* 48:6-:8, but Lack was more resistant, Tr. 145:12-:24; Lack Dep. 76:6-78:17, 87:3. In any event, Respondents dismissed the *Franco* appeal on July 11, 2005. TE 692.

On July 12, 2005, the young associate, in an email to Schwartz, summarized his view of the case this way:

---

[46]Howard B. Miller is an appellate lawyer at the Girardi Firm. Miller graduated from the University of Chicago Law School in 1960, clerked for Justice Roger J. Traynor on the California Supreme Court, and, in addition to an active practice, has taught at the University of Southern California School of Law. Miller Dep. 11:24-13:7.

As for the names changing, as a matter of law you need to name the right company. It is impossible to think that we can enforce a judgment against a company that was not named in the underlying action. We have explained to the Court that in Nicaragua the names "Company" and "Corporation" are interchangeable. The problem is that when the original complaint was filed it was represented to the Court that the translation was the actual writ. This was done based on Walter Gutierrez telling us that it was the actual writ. We later found out to the contrary and discovered that the actual writ named Dole Food Corporation, while the translation attached to the complaint states Dole Food Company, Inc. The Federal Courts do not take lightly to these kinds of misrepresentations.

TE 065-001.

On August 25, 2005, this Court issued its order to show cause, ordering Respondents to show cause "why it or he should not be required to reimburse the appellees for fees and expenses incurred in defending this appeal, and why it or he should not be suspended, disbarred, or otherwise sanctioned, under Federal Rules of Appellate Procedure 38 and 46 and 28 U.S.C. § 1912 and § 1927, for filing a frivolous appeal, falsely stating that the writ of execution issued by the Nicaraguan court named Dole Food Company, Inc. as a judgment debtor, falsely stating that the writ corrected mistakes in the judgment, and falsely stating that the notary affidavit constituted an accurate translation of the writ." TE 7-001 to -002.

## CONCLUSIONS AND RECOMMENDATIONS

Based on the foregoing findings of fact, the Special Master reaches the following conclusions of law and makes the following recommendations to the panel:

A.   *Sanctions for Excessive Costs for Unreasonably and Vexatiously Multiplying the Proceedings*

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." To be sanctionable under § 1927, therefore, counsel's conduct must multiply the proceedings in both an "unreasonable and vexatious manner." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002).

The key term in the statute is "vexatiously"; carelessly, negligently, or unreasonably multiplying the proceedings is not enough. While, "[o]ur cases have been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose sanction for attorneys' fees" under § 1927, *id.* at 1107, or whether there must be a finding of subjective bad faith, *see Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co. Sec. Litig.)*, 78 F.3d 431, 436 (9th Cir. 1996), what is clear from our case law is that a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under § 1927, *see Malhiot v. S. Calif. Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984), and a finding that the attorneys recklessly raised a *frivolous* argument which resulted in the multiplication of the proceedings is also sufficient to impose sanctions under § 1927, *see, e.g.*, *B.K.B.*, 276 F.3d at 1107 ("[R]ecklessness plus knowledge was sufficient to justify the imposition of § 1927 sanctions."); *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001) (holding that "recklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power"); *Keegan*, 78 F.3d at 436 ("[S]ection 1927 sanctions 'must be supported by a finding of subjective bad faith. Bad faith is present when an attorney knowingly or recklessly raises a *frivolous* argument[.]" (internal citations and quota-

tion marks omitted)); *id.* ("For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass. . . . [R]eckless non-frivolous filings, without more, may not be sanctioned.").

Therefore, regardless of whether recklessness alone suffices, *see Fink*, 239 F.3d at 993, or whether "[o]ur precedents plainly require more," *Keegan Mgmt.*, 78 F.3d at 436, § 1927 sanctions are justified in this case because Respondents' filings were made in bad faith insofar as Respondents filings to the Ninth Circuit were reckless *and* frivolous, *see, e.g.*, *id.*, and because Respondents recklessly and intentionally, misled this Court, *see Malhiot*, 735 F.2d 1138. Each constitutes independent grounds upon which § 1927 sanctions are justified.

Respondent Giraradi recklessly, and Respondents Lack, Traina, and the young associate intentionally, misled the Ninth Circuit. We have held that recklessly or intentionally misrepresenting facts constitutes "the requisite bad faith and intentional misconduct for which sanctions under § 1927 are appropriate." *Id.*; *accord Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1119 (9th Cir. 2000).

Lack knew in January 2003 that the Judgment was not against Dole Food Company; instead the Judgment was, in his words, "against the wrong entity" and that the "judgment needs to be against Dole Food Co." *See* TE 43; *see also* TE 19; Tr. 174:21-75:7 (testifying that he told Gutierrez to "fix" the Judgment). Despite this knowledge, Lack told the Ninth Circuit that Dole Food Company was named in the Judgment; he justifies this action by arguing that he relied on Gutierrez, a nonlawyer, who told him that the Judgment had been corrected. Lack knew firsthand that Gutierrez was untrustworthy, yet Lack engineered years of litigation, including this appeal to the Ninth Circuit, based solely on the assurances of Gutierrez—assurances which ran contrary to his own independent knowledge.

The young associate drafted the Opening Brief, which contends that Dole Food Company was the judgment debtor. He repeated that contention in the Reply Brief, although he knew that the Judgment was not against Dole Food Company. As he wrote in his August 9 memo to Traina, "Dole Food Company, Inc. was NOT named in the judgment." *See* TE 32-001 (emphasis in the original). By the time Traina finished reading the young associate's memo, Traina of course knew that Dole Food Company was not named in the Judgment. Despite this knowledge, Lack, Traina, and the young associate stated to the Ninth Circuit that Dole Food Company was named in the Judgment. Girardi also knew that the Judgment was against Dole Food Corporation, and not Dole Food Company. On April 22, 2004, days before the Respondents filed their Opening Brief with the Ninth Circuit, which argues that the Respondents had a Nicaraguan Judgment against Dole Food Company, Lack and Girardi signed an agreement with Venezuelan lawyers to enforce this same Nicaraguan Judgment in Venezuela. TE 030-001. That agreement expressly recognized that "[a] judgment for the amount of $489,400,000.00 (four hundred eighty nine million, four hundred thousand dollars) was obtained . . . against Dole Food Corporation, Inc . . . ." Despite this, Girardi contends that he was unaware of the fact that the briefs bearing his signature represented to the Ninth Circuit that Dole Food Company was named as the judgment debtor in Nicaragua, or as he put it, at "some point" he learned that "there was a problem with one of the named defendants," but he was "told that the matter had been corrected."[47] Tr. 446:13-:15. Nevertheless, Girardi's willful ignorance of positions he propagates to the Ninth Circuit does not insulate him from sanctions. *See, e.g.*, *In re Mitchell*, 901 F.2d 1179, 1188 (3d Cir. 1990) ("The fact that an attorney of record may make an agreement with some other person, attorney or layman, regarding a division of labor, does not diminish the attorney's *personal responsibility* for compliance with

---

[47]Girardi stated, and Lack confirmed, that he (Girardi) authorized Lack to affix Girardi's signature to the Venezuelan agreement.

the rules of this court, *and liability for discipline if those rules are not complied with*." (emphasis in original)). At the very least, Girardi was reckless in failing to live up to his personal obligation as the leading attorney of record.

Respondents, including Girardi, are also subject to § 1927 sanctions for recklessly making frivolous filings to the Ninth Circuit. A "frivolous" filing is one "that is *both* baseless and made without a reasonable and competent inquiry." *See Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005) (construing "frivolous filing" in the context of Rule 11 and quoting *Keegan Mgmt.*, 78 F.3d at 434). That is, in the contexts of § 1927, frivolousness should be understood as referring to legal or factual contentions so weak as to constitute objective evidence of improper purpose. *Cf.* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27 (3d ed. 2000) (discussing frivolousness in the context of the court's inherent powers to sanction bad-faith conduct).

Respondents' factual contentions were so weak—they were baseless and made without reasonable and competent inquiry—that they provide objective evidence of improper purpose. Respondents, in their briefs to the Ninth Circuit, falsely stated that the Writ of Execution issued by the Nicaraguan court named Dole Food Company, Inc. as a judgment debtor, *see* TE 39-011, 39-020, 39-030, falsely stated that the Writ corrected mistakes in the Judgment, *see* TE 39-035, and falsely stated that the Notary Affidavit constituted an accurate translation of the Writ, *see* TE 39-011, 39-020, 39-030, 39-036. None of these statements has a basis or foundation in fact, and each was made without a reasonable and competent inquiry; indeed, some Respondents affirmatively knew that the statements were false.

Lack knew in January 2003 that the Judgment was not against Dole Food Company. *See* TE 43; *see also* TE 19. As Lack and the other Respondents admit, they never saw a Nicaraguan Judgment naming Dole Food Company as a judgment

debtor. *See* Tr. 175:24-76:13. Yet, Lack made this baseless statement, without any evidence supporting this assertion. Lack contends that he was relying on Gutierrez, who assured him that the Judgment was changed; such assurances from a nonlawyer, however, especially one whose veracity Lack had reason to question, do not constitute a reasonable and competent inquiry.

The young associate drafted the Opening Brief, which contends that the Nicaragua Judgment was against Dole Food Company, without ever reviewing the Judgment. *See* Assoc. Dep. 100:2-:17. As noted, he knew that the Judgment was not against Dole Food Company, *see* TE 32-001, as did Traina. Based on the Venezuelan agreement, it is also clear that Girardi also knew that the Judgment was against Dole Food Corporation. Yet, all of these Respondents informed the Ninth Circuit that Dole Food Company was named in the Judgment; a reasonable and competent inquiry would have exposed this falsehood for what it was: baseless. Their failure to conduct any investigation provides further objective evidence of an improper purpose.

The statement that the Writ of Execution corrected mistakes in the Judgment is also frivolous; it too lacks a basis or foundation in fact and was made without a reasonable and competent inquiry. Respondents presented no evidence that the Writ corrected mistakes in the Judgment.[48] Respondents not only failed to make a reasonable and competent inquiry to determine whether the Writ corrected mistakes in the Judgment, they made no inquiry at all. Indeed, Lack testified that he did not ask and that Gutierrez provided "no explanation [as to] how [the names] got from Shell Oil to Shell Chemical. None." Tr. 204:23-05:2. As noted, Lack knew from the begin-

---

[48]Indeed, the August 11, 2003 order from the Nicaraguan court confirming that Dole Food Corporation was the judgment debtor directly contradicts the notion that the Writ "corrected" the judgment. *See* TE 705E.5850 (English); *see also* TE 705S-5794 (Spanish); Espinoza Dep. 124:16.

ning that the Judgment was not against Dole Food Company, but he argues that he was justified in taking the position that the Writ "corrected" the Judgment because he was relying on Gutierrez's assertions that the Writ had corrected the Judgment. *See* Lack Post-Hearing Brief 16-18. By Lack's own admission, however, Gutierrez would misrepresent facts. For example, early in the litigation, Gutierrez sent Lack several emails, informing Lack that Gutierrez was sending him a certified copy of the Writ. *See* TE 25-001, 134-001, 46-001. Lack claims that those emails were a ruse to shield Gutierrez from pressure from the Nicaraguan clients. Tr. 117:20-:25. Based on the emails regarding the certified copy of the Writ, Lack either received the Writ in 2003—long before 2005, the year he claims to have first seen the Writ—or, Lack learned in 2003 that Gutierrez would create an elaborate deception in order to shield himself from pressure. Either of these conclusions demonstrates that Lack was reckless. Lack's failure to make a reasonable and competent inquiry regarding the statement that the Writ had modified the Judgment constitutes evidence of an improper purpose.

Traina also failed to make a reasonable and competent inquiry. Before filing briefs in the district court and the Ninth Circuit, Traina never even requested the actual Writ of Execution from the Ojeda Firm, even though it was always available to him. *See* Traina Dep. 193:12-94:10; *see also* Tr. 576:20-:23. Despite this, Traina contends that he was justified in stating to the Ninth Circuit that the Writ corrected mistakes in the Judgment because he "believed everything in the Declarations," Traina Dep. 142:11-43:12, and one of the expert declarations, ostensibly from Mejia, stated that "the judgment, as a amended [*sic*] is contained in the writ of execution," TE 102-001 to -002. This is a breathtaking position. Traina drafted the "expert declarations" and never spoke with Mejia, who later disowned the declaration. *See* Traina Dep. 126:25-28:10. Traina's contention that no further investigation was needed because he was relying on statements that he

himself drafted is preposterous, and it is stunning that he continues to cling to this position.

Even if the Special Master were to accept Lack's and Traina's explanations, Lack, Girardi, Traina, and the young associate nevertheless failed to correct their filings even after it became apparent to them that the Writ did not "correct" errors in the Judgment. In June 2005, following the motion for sanctions but before the case was to be argued before the Ninth Circuit, the young associate and Traina told Girardi and Lack that the "Writ names Dole Food Corporation—not Dole Food Company." TE 69-005. Even assuming that earlier in the litigation there was some merit to the position that the Writ "corrected" errors in the Judgment, once they were informed by their own co-counsel in no uncertain terms that that was not the case, Lack and Girardi should have so informed the Ninth Circuit.[49] By failing to do so, Lack and Girardi, as well as Traina and the young associate, violated § 1927's duty to correct or withdraw litigation positions after it becomes obvious that they are meritless. *See e.g.*, *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 245 (5th Cir. 1998) (affirming § 1927 sanctions for the "willful continuation of a suit known to be meritless"). Rather than correcting the error, Respondents attempted to cover up the error by opposing Defendants motion to supplement the record with the actual Writ, resulting in further unreasonable and vexatious multiplication of the proceedings. Their resistance to the production of the actual Writ also provides further evidence of an improper purpose.[50]

The statement that the Notary Affidavit constituted an accurate translation of the Writ was also baseless and made

---

[49]Of course the young associate and Traina were under the same obligation to correct the filings.

[50]Indeed, Lack, in his response to the Order to Show Cause, swore that he promptly turned over the Writ to opposing counsel, TE 11-013, and did not resist its production, Tr. 223:12-:25.

without any reasonable and competent inquiry. The Notary Affidavit is not an accurate translation of the Writ of Execution; where the names Dole Food Corporation and Shell Oil Company appear in the Writ, the Notary Affidavit substitutes Dole Food Company and Shell Chemical Company. *Compare* TE-16, *with* TE 14-016. Indeed, the Notary Affidavit is internally inconsistent on its face: it states both that Dole Food Company is a judgment debtor, *see* TE 02-033, *and* that Dole Food Company was denied the opportunity to appear because it was "not one of the companies sued," *see* TE 02-028. Respondents made this baseless claim without a reasonable and competent inquiry. Respondents never even asked their Nicaraguan counsel for the Writ, or a copy, to compare the Notary Affidavit with the Writ, nor did they consult with any of the Nicaraguan lawyers. *See* Espinoza Dep. 23:6-:10, 44:24-45:13, 47:24-48:15; Mejia Dep. 22:5-:11; Lack Dep. 130:5-:15, 188:7-:9; Assoc. Dep. 40:19-41:18; Traina Dep. 69:18-70:22. This, despite Judge Manella's characterization of the Notary Affidavit as "suspect." *See* TE 48-008. Finally, in June 2005, Respondents examined the actual Writ. Based on this, Traina and the young associate concluded for themselves and informed Lack and Girardi that "[t]hroughout this case we have argued that the [Notary Affidavit] was an accurate translation of the Writ—the actual Writ proves that in fact the translation was not accurate." TE 069-005. As noted, Respondents again failed to inform the Ninth Circuit of this realization; instead, opposing Defendants' effort to supplement the record with the actual Writ, resulting in further unreasonable and vexatious multiplication of the proceedings.

Respondents intentionally and recklessly misled this court, resulting in the unreasonable and vexatious multiplication of the proceedings. And Respondents recklessly raised frivolous arguments to this court, resulting in the unreasonable and vexatious multiplication of the proceedings.

B.   *Sanctions for Bringing a Frivolous Appeal*

Rule 38 provides that "[i]f a court of appeals determines than an appeal is frivolous, it may, after a separately filed

motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. App. P. 38. In addition to permitting sanctions against the appellant directly, Rule 38 and § 1912 permit the imposition of personal sanctions against counsel. *See Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 416 (9th Cir. 1985).

"An appeal is frivolous if the results are obvious, or the arguments of error are wholly without merit." *George v. City of Morro Bay (In re George)*, 322 F.3d 586, 591 (9th Cir. 2003) (quoting *Maisano v. United States*, 908 F.2d 408, 411 (9th Cir. 1990)). On appeal, Respondents argued that the district court erred in holding that Dole was not a sham defendant because the "plaintiffs have an enforceable judgment against each of the defendants, including Dole [Food Company.]" TE 039-031. To support this, Respondents stated that "[t]he Writ of Execution, as the final word of the Nicaraguan Court, names Dole Food Company, Inc. as a judgment debtor," and that Appendix A, (the Notary Affidavit), was the Writ of Execution. TE 039-031. These factual statements were, of course, false. Without these misrepresentations, the result would be obvious: (1) Dole was not properly joined, and therefore, removal was proper; and (2) dismissal was proper because Respondents failed to attach an enforceable judgment. Respondents' appeal, therefore, was frivolous. *See Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1052 (9th Cir. 1985).

Indeed, the result was obvious to the young associate, the least experienced appellate lawyer to review the case, and to Miller, the most experienced appellate lawyer to review the case. As the young associate noted in his pre-reply-brief memo, "[d]efendants will have a good argument that our Appeal is frivolous based on the claim that since Dole was never named in the Nicaraguan judgment we were aware that Dole was not a proper defendant in our enforcement action." TE 32-001. And, Miller, after less than a day of reviewing the case, concluded that the "overwhelming emphasis" on appeal

was the contention that the Writ named Dole Food Company, and given that, as Miller put it, "[t]hat [contention] seemed to me to be the center of gravity on the briefs, [any] attempt to say there were other arguments given the importance of that center of gravity would not make a difference in the outcome of the appeal." Miller Dep. 94:7-96:6.

Respondents, however, argue that their appeal was not frivolous because the issue on appeal was not whether Dole was named in the Nicaraguan Judgment, but whether the district court improperly resolved factual disputes. This argument is of no avail. For one, Respondents argued to the Ninth Circuit that they had a Judgment against Dole Food Company, and the document they called the Writ of Execution was such a Judgment. And of course, the Notary Affidavit *on its face* states that it is an affidavit by a notary public translated in the presence of plaintiffs' counsel. Respondents did not argue that whether they had a Judgment against Dole Food Company was a disputed fact that should not be resolved by the district court. Even if they did argue the latter, the appeal is still frivolous because they knew that Dole Food Company was not named in the Judgment and the document they were peddling as a Writ of Execution was nothing more than a suspect affidavit. The core issue on appeal was whether Respondents had a Judgment against Dole Food Company. Lack and the young associate knew that Dole Food Company was not named in the Judgment, and the remaining Respondents were, at the very least, reckless in asserting that Dole Food Company was named in the Nicaraguan Judgment.[51] Respondents' ex post

---

[51]Moreover, the notion that the appeal was not frivolous because they were challenging Judge Manella's determination that Appendix A was not the Writ is wrong for another reason. It is blackletter law that "the defendant is entitled to present facts showing the joinder to be fraudulent." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). In other words, Judge Manella did not err in considering facts outside the pleadings.

recharacterization of the appeal does not change that reality. The appeal was frivolous, and sanctionable under Rule 38.**[52]**

## Conclusion

In a high-stakes gamble to enforce a foreign Judgment of nearly a half billion dollars, Respondents initiated and directed years of litigation against Defendants. Respondents efforts went beyond the use of "questionable tactics" — they crossed the line to include the persistent use of known falsehoods. This litigation was based on three falsehoods: that Dole Food Company was named as a judgment debtor by a Nicaraguan court, that the Nicaraguan court corrected any mistakes it might have made regarding Dole Food Company in its judgment by the Writ of Execution, and that Respondents had submitted the corrected Writ of Execution to the state court and the federal district court. Respondents made these false representations knowingly, intentionally, and recklessly. Their actions vexatiously multiplied the proceedings at great expense to Defendants and required the Ninth Circuit to deal with a frivolous appeal.

The court cannot and will not tolerate members of the bar employing the use of known falsehoods to further their objectives, no matter how appealing the underlying cause of their clients may be. For such conduct, Respondents should face substantial sanctions commensurate with the sums at stake, the efforts and resources expended in this litigation, and the gravity of their misconduct.

---

**[52]**"Appellate Rule 38 and § 1912 are read *in pari materia* to authorize the imposition of a monetary sanction for the filing and prosecution of any frivolous appeal." Joseph, *supra*, § 31; *see, e.g. In re George I*, 322 F.3d at 591; *NLRB v. Unbelievable, Inc.*, 71 F.3d 1434, 1441 (9th Cir. 1995). For this reason, the Special Master has not separately analyzed Respondents' liability for monetary sanctions under 28 U.S.C. § 1912 apart from their liability under Rule 38.

The Special Master recommends to the panel that Respondents be sanctioned by being required to reimburse Defendants for the attorneys' fees and costs incurred by Defendants in the *Franco* appeal,[53] as follows:[54]

1. Respondents Thomas V. Girardi and the Girardi Firm shall reimburse Defendants Dow Chemical Company, Dole Food Company, and Shell Chemical Company (collectively, "Defendants") their attorneys' fees and costs, but not to exceed the aggregate sum of $125,000.00.

2. Respondents Walter J. Lack and the Lack Firm shall reimburse Defendants their attorneys' fees and costs, but Lack's individual liability shall not exceed the aggregate sum of $250,000.00.

3. Respondent Paul A. Traina shall reimburse Defendants their attorneys' fees and costs, but not to exceed the aggregate sum of $10,000.00

---

[53]Although it may well be academic because of the per-Defendant cap on the reimbursements recommended below, the Special Master includes as part of the "attorneys' fees and costs incurred by Defendants in the *Franco* appeal," attorneys' fees and costs incurred by Defendants in prosecuting their motion for sanctions. Whether such fees and costs are recoverable as part of the sanctions imposed is an open question in the Ninth Circuit and the other circuits appear to be divided. The Special Master believes that the better view is the one adopted in *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 387-88 (3d Cir. 1997) (affirming a sanctions award imposed under the trial court's inherent powers that included attorney's fees incurred in the sanctions proceedings), *overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331, 338-39 (3d Cir. 2001). The Ninth Circuit earlier held that fees and costs incurred in pursuing a Rule 11 sanctions motion are not recoverable. *Lockary v. Kayfetz*, 974 F.2d 1166, 1177-78 (9th Cir. 1992). That holding, however, was overruled by the 1993 amendments to Rule 11, which now expressly permits such awards. *See Margolis v. Ryan*, 140 F.3d 850, 854 (9th Cir. 1998) ("The rule in *Lockary*, enunciated in 1992, is no longer good law.").

[54]Pursuant to the Bifurcation Order, *see* note 2, *supra*, the matter of possible sanctions/discipline under Rule 46 is addressed by a separate, sealed order.

4. Respondent [the young associate] shall reimburse Defendants their attorneys' fees and costs, but not to exceed the aggregate sum of $5,000.00.

5. Respondent the Lack Firm shall be jointly and severally liable for the sanctions imposed on Respondents Traina and the young associate so that its aggregate liability shall not exceed $265,000.00.

6. Respondents aggregate liability to each Defendant shall not exceed $130,000.00, or said Defendants' actual attorneys' fees and costs, whichever is less.

7. Counsel for Respondents and counsel for Defendants shall meet and confer and shall file a written report with the Special Master within the time to be specified by the panel on whether they have reached agreement on the sum owing from each Respondent to each Defendant. If complete agreement is not reached, their report shall set forth the issues that remain to be resolved and resolution of those remaining issues are recommitted by the panel to the Special Master.

\* \* \* \* \*

**Note to Counsel:** By analogy to Fed. R. Civ. P. 72(b), any party wishing to file objections to this Report and Recommendation must do so within ten (10) days of being served with a copy of this Report.

### Counsel of Record

Thomas V. Girardi, Howard B. Miller, Girardi & Keese, Walter J. Lack, Paul A. Traina, Sean A. Topp, Engstrom, Lipscomb & Lack, Los Angeles, CA, for plaintiffs-appellants.

Michael P. Fordas, Kirkland & Ellis, Chicago, IL, for defendant-appellee Dow Chemical Co.

David W. Ogden, Wilmer, Cutler Pickering Hale & Dorr, Washington, DC, for defendant-appellee Shell Chemical Co.

Alan E. Friedman, Jones Day, Los Angeles, CA, for defendant-appellee Dole Food Co., Inc.

Thomas J. Nolan, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for respondents Thomas V. Girardi and Girardi & Keese.

Robert C. Baker, Baker, Keener & Nahra, Los Angeles, CA, for respondents Walter J. Lack, Paul A. Traina, Sean A. Topp, and Engstrom, Lipscomb & Lack.